[No. 4971. Decided December 20, 1904.]

*In the Matter of the Petition of* RONALD AUBREY *for a Writ of Habeas Corpus.*[1]

CONSTITUTIONAL LAW—LIBERTY OF CONTRACT—POLICE POWERS—LICENSING OF BLACKSMITHS. Laws 1901, p. 118, requiring horseshoers to pass an examination and pay a license fee and providing a penalty for practicing their trade without a license, is not a valid exercise of the police power, but is unconstitutional, as an arbitrary interference with personal liberty and private property without due process of law.

Application to the supreme court for a writ of habeas corpus, filed December 16, 1903. Writ granted.

*H. F. Norris* and *Vance & Mitchell* for petitioner, to the point that the act was an arbitrary interference with the liberty of the citizen, cited: *Bessette v. People,* 193 Ill. 334, 62 N. E. 215, 56 L. R. A. 558; *Norris v. Waco,* 57 Tex. 635; *Harrodsburg v. Renfro* (Ky.), 58 S. W. 795, 51 L. R. A. 897; *Chaddock v. Day,* 75 Mich. 527,

[1]Reported in 78 Pac. 900.

42 N. W. 977, 13 Am. St. 468, 4 L. R. A. 809; *Ex parte Frank,* 52 Cal. 606; *Sayre Borough v. Phillips,* 148 Pa. St. 482, 24 Atl. 76, 33 Am. St. 842, 16 L. R. A. 49; *In re Haskell,* 112 Cal. 412, 44 Pac. 725, 32 L. R. A. 527; *People ex rel. Fleischman v. Caldwell,* 168 N. Y. 671, 61 N. E. 1132; *State ex rel. Winkler v. Benzenberg,* 101 Wis. 177, 76 N. W. 345; *Ex parte Sing Lee,* 96 Cal. 354, 31 Pac. 245, 31 Am. St. 218, 24 L. R. A. 195; *Dent v. West Virginia,* 129 U. S. 114, 9 Sup. Ct. 231. It is an unlawful delegation of legislative power. *Yick Wo v. Hopkins,* 118 U. S. 356, 6 Sup. Ct. 1064; *Walsh v. Denver,* 11 Colo. App. 523, 53 Pac. 458; *Braceville Coal Co. v. People,* 147 Ill. 66, 35 N. E. 62, 37 Am. St. 206, 22 L. R. A. 340; *Harmon v. State,* 66 Ohio St. 249, 64 N. E. 117, 58 L. R. A. 618; *State v. Carey,* 4 Wash. 424, 30 Pac. 729.

*Fremont Campbell, Charles O. Bates* and *Walter M. Harvey,* for respondent. The horseshoers' act is within the police power of the state. *People ex rel. Nechamcus v. Warden of City Prison,* 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718; *Logan v. State,* 5 Tex. App. 306, 22 Am. & Eng. Ency. Law, 931; *State v. Carey,* 4 Wash. 424, 30 Pac. 729. The act does not violate § 12, art. 1, of the constitution, and is not class legislation. *People ex rel. Hobach v. Buttling,* 35 N. Y. Supp. 19; *Hayes v. Territory,* 2 Wash. Ter. 286, 5 Pac. 927; Cooley, Const. Lim. (5th ed.), p. 482; *Fitch v. Applegate,* 24 Wash. 28, 64 Pac. 147; *Cook v. State,* 90 Tenn. 407, 16 S. W. 471, 13 L. R. A. 183. Nor does it violate the constitution of the United States. *Missouri v. Lewis,* 101 U. S. 22, 25 L. Ed. 989. The act is not in conflict with the constitution because certain persons are exempted from the operation of the act. *State ex rel. Smith v.*

*Board of Dental Examiners,* 31 Wash. 492, 72 Pac. 110. It is not in conflict with the constitution by reason of the fact that it delegates to the mayor of cities the power to appoint a board, who shall determine the qualifications of the applicants for certificates. *People v. Warden of City Prison,* and *Logan v. State, supra.*

PER CURIAM.—This is an original application instituted in this court by the petitioner for a writ of habeas corpus. From the record it appears, that the petitioner is a citizen of the state of Washington, residing at the city of Tacoma, therein, where he has resided for fourteen years last past; that during such time he has pursued and practiced the trade and occupation of a blacksmith and horseshoer, on which trade, solely, he depends for the livelihood, support, and maintenance of himself and his family; that he was arrested at the city of Tacoma on the 17th day of December, 1903, by one Martin Garret, a constable for Tacoma precinct, and imprisoned and detained by him on a criminal warrant issued by one C. E. Griffin, a justice of the peace in and for Tacoma precinct, charging him with having practiced the trade of a master horseshoer, for hire, without complying with the provision of the act of March 11, 1901, relating to master horseshoers. The complaint on which the warrant of arrest was issued is as follows:

"That on or about the 22nd day of August, A. D. 1903, in the county of Pierce, in the state of Washington, the above named defendant, Ronald Aubrey, then and there being, did unlawfully and knowingly violate and neglect to comply with the provisions of the act of the legislature of the state of Washington, entitled 'An act requiring horseshoers in the cities of the first, second and third classes of this State to pass an examination, and providing for a board of examiners in said cities, and

providing a penalty for the violation of the provisions of this act, and repealing an act entitled "An act requiring horseshoers to pass an examination, and providing for a board of examiners," approved March 13, 1899,' approved March 11, 1901; in this that the said Ronald Aubrey, then and there being, did unlawfully and knowingly practice horseshoeing as a master horseshoer for hire, in the city of Tacoma, said county and state, said city being a city of the first class, and without registering as such in accordance with the provisions of said act, contrary to form of the statute in such cases made and provided, and against the peace and dignity of the state of Washington. Wherefore, said complainant prays that the said defendant may be arrested and dealt with according to law."

The main contention of relator's counsel is that the above enactment, under which petitioner was arrested and held in custody by respondent, is unconstitutional and void, under the provisions of both the state and federal constitutions, in that it deprives relator of his liberty and property without due process of law, and denies to him the equal protection of the laws. The enactment in question is found in the session laws of Washington, 1901, p. 116, chapter 67, and is entitled, "An act requiring horseshoers in cities of the first, second and third classes in this state to pass an examination, and providing for a board of examiners in said cities, and providing a penalty for the violation of the provisions of this act, and repealing an act entitled 'An act requiring horseshoers to pass an examination, and providing for a board of examiners,' approved March 13, 1899."

Sections 1 and 2 of this act provide for the registration of master and journeyman horseshoers in cities of the classes above named. Section 3 provides for the issuance of certificates to such horseshoers. Section 4 provides that,

"In every city affected by this act, there shall be appointed a board of examiners consisting of one veterinary and two master horseshoers and two journeyman horseshoers which shall be called 'horseshoers board of examiners,' who shall be residents of such city, and whose duty it shall be to carry out the provisions of this act, and shall have a power to fix a standard of examinations to test the qualifications of applicants. The members of said board shall be appointed by the mayor of such city, and the term of office shall be five (5) years, except that the members of said board first appointed shall hold office for the term of one, two, three, four and five years, as designated by the mayor and until their successors shall be duly appointed. The board of examiners shall have a regular place of meeting and shall hold sessions for the purpose of examining applicants desiring to practice horseshoeing as master or journeyman horseshoers in each city affected by this act, not later than three days after applications have been presented to them, and shall grant a certificate to any person showing himself qualified to practice, and the board shall receive as compensation a fee not exceeding ten ($10) dollars from each person examined. Three members of said board shall constitute a quorum."

Section 5 provides for the payment of a registration fee of fifty cents to the city treasurer of the city in which the applicant may desire to register. Section 6 prescribes penalties for the violation of the provisions of the act. Article 1, section 3, of our state constitution provides that, "No person shall be deprived of life, liberty, or property without due process of law." The fourteenth amendment of the constitution of the United States contains a similar provision, and further prescribes that no state shall deny to any person within its jurisdiction the equal protection of the laws.

The following quotation is taken from the brief of the counsel for petitioner Aubrey.

"We admit, in the outset, that the state has power to tax all trades and occupations, and that this power is only limited by the constitutional requirement that its exercise shall fall upon all citizens of like class and similar conditions equally. We deny that the legislature can license, for purposes purely of regulation and restraint or prohibition, any of the usual, ordinary, and harmless occupations of life."

Respondent's counsel argue that the act under consideration should be upheld as a legitimate and proper exercise of the police power of the state, and not upon the theory that this law was enacted for the purposes of raising revenue. They say: "That it is within the police power of the state to regulate such occupations or business enterprises as may, if unrestricted in their exercise, be injurious to the public health, safety, morals or general welfare, even though they may be perfectly lawful."

*State v. Carey,* 4 Wash. 424, 30 Pac. 729, was a case where the defendant was prosecuted and convicted for practicing medicine without having first obtained a license for such purpose, pursuant to the statutes of this state. Laws 1889-90, p. 114. That enactment was sustained by this court as a proper exercise of the police power inherent in the state. In the opinion of the court in that case, the following language was used:

"The practice of medicine and surgery is a vocation that very nearly concerns the comfort, health and life of every person in the land. Physicians and surgeons have committed to their care the most important interests, and it is an almost imperious necessity that only persons possessing skill and knowledge should be permitted to practice medicine and surgery."

In the case of *State ex rel. Smith v. Board of Dental Examiners,* 31 Wash. 492, 72 Pac. 110, we held that the

laws of this state relating to the practice of dentistry (Session Laws 1901, p. 315, amending the dentistry act of 1893) fell within the exercise of the police power of this state, and hence were not unconstitutional on the ground of infringement of individual rights. At page 497 in this volume, it is observed in the opinion of the court that,

"The wisdom of such regulations, pertaining not only to dentistry, but also to the practice of medicine and surgery, is apparent. It is of the highest importance to the state that suffering and afflicted humanity shall not be subjected to the care and treatment of unlearned and unskilled persons. In its effort to prevent such a misfortune to its people, the state may adopt a standard for the test of fitness to engage in the work of what should be a learned profession."

No argument is needed to show that the practice of the above professions is closely related to the health and comfort and welfare of the people. In fact, it is a matter of common knowledge that the practice of medicine and surgery by unskilled parties may seriously affect or endanger the very life of individuals treated or operated upon. The exercise of the police power by the state, within its proper sphere, is well calculated to promote and safeguard the public welfare and subserve the best interests of society. But this power, however comprehensive it may be under our fundamental law, has its limitations. In *In re Jacobs*, 98 N. Y. 108, 110, Earl, J., says:

"The limit of the power cannot be accurately defined, and the courts have not been able or willing definitely to circumscribe it. But the power, however broad and extensive, is not above the Constitution. . . . Generally it is for the legislature to determine what laws and regulations are needed to protect the public health

and secure the public comfort and safety, and while its measures are calculated, intended, convenient and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property cannot be arbitrarily invaded."

Again, in *Slaughter-House Cases,* 16 Wall. 36, 87, Mr. Justice Field observes:

"All sorts of restrictions and burdens are imposed under it [the police power], and when these are not in conflict with any constitutional prohibitions, or fundamental principles, they cannot be successfully assailed in a judicial tribunal. . . . But under the pretense of prescribing a police regulation the state cannot be permitted to encroach upon any of the just rights of the citizen, which the constitution intended to secure against abridgement."

It may be stated, as a general principle of law, that it is the province of the legislature to determine whether the conditions exist which warrant the exercise of this power; but the question, what are the subjects of its exercise, is clearly a judicial question. One may be deprived of his liberty, and his constitutional rights thereto may be violated, without the actual imprisonment or restraint of his person. "Liberty" in its broad sense, as understood in this country, means the right, not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work when he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. All laws, therefore, which impair or trammel these rights—which limit him in his choice of a trade or profession—are infringements upon his fundamental rights of liberty, which are under constitutional protection.

In *People ex rel. Nechamcus v. Warden of City Prison,* 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718, the court held, that Chap. 602, Laws of 1892 of the state of New York, which provided for the creation of a board for the examination of plumbers, and which prohibited any person to exercise the calling of a master plumber without passing an examination before such board, was a valid exercise of the police power, for the reason that the work of plumbing is essential to the comfort and health of the inhabitants of cities. This decision was rendered by a divided court. Three members of the above court dissented. Justice Peckham, who afterwards became an associate justice of the supreme court of the United States, delivered a strong dissenting opinion in which the following language occurs:

"The legislature might probably provide for a sanitary inspection of plumbing work, and thus secure a kind of work, as to its system and sufficiency, which might fairly be said to tend towards the protection of the health of the general public. But the trade of the practical plumber is not one of the learned professions, nor does such a tradesman hold himself out in any manner as an expert in the science of 'sanitation,' nor is any such knowledge expected of him, and this act, when practically enforced, may or may not exact it of him."

Assuming, for the purpose of the present controversy, that the propositions announced by the majority of the court in the New York case last cited are good law, still, we think that there is a marked distinction between the business of plumbers and that of horseshoers, in the matter of the pursuit of their respective avocations in cities. The plumber's business may concern and directly affect the health, welfare, and comfort of the inhabitants who have occasion to call such services into action in the community in which he plies his vocation, while the pur-

suit of the trade of a horseshoer, under ordinary circum-
stances and normal conditions, would have no such effect.

The supreme court of the United States in *Allgeyer v.
Louisiana,* 165 U. S. 589, 17 Sup. Ct. 427, in defining
the word "liberty" as the same appears in the fourteenth
amendment of the Federal Constitution, uses this lan-
guage:

"The liberty mentioned in that amendment means not
only the right of the citizen to be free from mere physical
restraint of his person by incarceration, but the term is
deemed to embrace the right of the citizen to be free in
the enjoyment of all his faculties; to be free to use them
in all lawful ways; to live and work where he will; to
earn his livelihood by any lawful calling; to pursue any
livelihood or avocation, and for that puropse to enter
into all contracts which may be proper, necessary and
essential to his carrying out to a successful conclusion
the purposes above mentioned."

The opinion of the court in that case was delivered by
Mr. Justice Peckham, who wrote the dissenting opinion
in *People v. Warden of City Prison, supra,* as above
noted.    The only cases directly upon the point are from
Illinois and New York, in each of which an enactment
similar to the one here in question is held unconstitu-
tional, as being an arbitrary interference with personal
liberty and private property of the citizen without due
process of law.    *Bessette v. People,* 193 Ill. 334, 62
N. E. 215, 56 L. R. A. 558; *People v. Beattie,* 89 N. Y.
Supp. 193.

It seems to us that these cases state the correct rule.
We conclude, therefore, that the act complained of can-
not be sustained as a legitimate exercise of the police
power, under the fundamental law of this state, and that
the prayer of petitioner must be granted.    The petitioner
is discharged.