[No. 5967.   Decided March 9, 1906.]

THE STATE OF WASHINGTON, on the Relation of A. J. Richey, Plaintiff, v. L. C. SMITH, Sheriff of King County, Respondent.[1]

CONSTITUTIONAL LAW — CIVIL RIGHTS — LICENSING OF PLUMBERS. Laws 1905, p. 126, regulating the business of plumbing and requiring plumbers to secure a license from an examining board cannot be sustained as a health regulation, and infringes the state and Federal constitutions by depriving them of the pursuit of happiness and liberty to pursue their chosen calling.

Application filed in the supreme court November 21, 1905, for a writ of habeas corpus, to release from custody a plumber, convicted before a justice of the peace of engaging in the business of plumbing without having obtained a license. Denied.

E. H. Flueck, for relator, contended, among other things, that limiting the act to cities of over ten thousand inhabitants, violates Const., art. 1, § 12 and the 14th Amendment of the Federal Constitution, in that it is an arbitrary classification. State ex rel. Chapel v. Justus, 90 Minn. 474, 97 N. W. 124; State ex rel. Douglas v. Ritt, 76 Minn. 531, 79 N. W. 535; State v. Cooley, 56 Minn. 540, 58 N. W. 150; Nichols v. Walter, 37 Minn. 264, 33 N. W. 800; Johnson v. St. Paul etc. R. Co., 43 Minn. 222, 45 N. W. 156, 8 L. R. A. 419; Lavallee v. St. Paul etc. R. Co., 40 Minn. 249, 41 N. W. 974; Murray v. Board of Com'rs, 81 Minn. 359, 84 N. W. 103, 83 Am. St. 379, 51 L. R. A. 828; McDaniels v. Connelly Shoe Co., 30 Wash. 549, 71 Pac. 37; In re Camp, 38 Wash. 393, 80 Pac. 547; In re Jacobs, 98 N. Y. 98, 50 Am. Rep. 636; State ex rel. Richards v. Hammer, 42 N. J. L. 435; State v. Inhabitants of Trenton, 54 N. J. L. 444, 24 Atl. 478; Frorer v. People, 141 Ill. 171, 31 N. E. 395, 16 L. R. A. 492; Lippman v. People, 175 Ill. 101, 51

[1]Reported in 84 Pac. 851.

N. E. 872; *State v. Loomis,* 115 Mo. 307, 22 S. W. 350, 21 L. R. A. 789; *State v. Hinman,* 65 N. H. 103, 18 Atl. 194, 23 Am. St. 22; *State v. Pennoyer,* 65 N. H. 113, 18 Atl. 878; *Gulf etc. R. Co. v. Ellis,* 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666; *Connoly v. Union Sewer Pipe Co.,* 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679; *Magoun v. Illinois etc. Bank,* 170 U. S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1043; *Billings v. Illinois,* 188 U. S. 97, 23 Sup. Ct. 272, 47 L. Ed. 403; *Kentucky Railroad Tax Cases,* 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414; *In re Sam Kee,* 31 Fed. 680; *In re Yot Sang,* 75 Fed. 983; *Stockton Laundry Case,* 26 Fed. 611; *Kane v. Erie R. Co.,* 133 Fed. 681; *In re Grice,* 79 Fed. 627; *Ritchie v. People,* 155 Ill. 98, 40 N. E. 454, 46 Am. St. 315, 29 L. R. A. 79. Section 10, giving the board arbitrary power to determine the applicant's competency, violates, Const. art. 1, § 3, and the Fourteenth Amendment. *Harmon v. State,* 66 Ohio St. 249, 64 N. E. 117; *Baltimore v. Radecke,* 49 Md. 217, 33 Am. Rep. 239; *Ex parte Sing Lee,* 96 Cal. 354, 31 Pac. 245, 31 Am. St. 218; *Los Angeles v. Cemetary Association* (Cal.) 57 Pac. 153; *State v. Mahner,* 43 La. Ann. 496, 9 South. 480; *State v. Julow,* 129 Mo. 163, 31 S. W. 781, 50 Am. St. 443, 29 L. R. A. 257; *Charles v. Marion,* 98 Fed. 166; *Yick Wo v. Hopkins,* 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; *Chicago etc. R. Co. v. Chicago,* 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; *Holden v. Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780. Section 10 creates a favored class. *Harmon v. State,* 66 Ohio St. 249, 64 N. E. 117, 58 L. R. A. 618; *State v. Inhabitants of West Hoboken,* 54 N. J. L. 508, 24 Atl. 477; *Noel v. People,* 187 Ill. 587, 58 N. E. 616, 79 Am. St. 238, 52 L. R. A. 287. That the occupation of a plumber is not properly a subject for police regulations, see, also: 1 Tiedeman, State and Federal Control, pp. 236-238; *State v. Brown* 37 Wash. 97, 79 Pac. 635; *In re Aubrey,* 36 Wash. 308, 78 Pac. 900; *People ex rel. Nechamcus v. Warden,* 144 N. Y. 529, 39 N. E. 686, dis-

senting opinion; *People ex rel. Tyroler v. Warden of City Prison,* 157 N. Y. 116, 51 N. E. 1006, 68 Am. St. 763, 43 L. R. A. 264; *People v. Marx,* 99 N. Y. 377, 52 Am. Rep. 34; *Ritchie v. People,* 155 Ill. 98, 40 N. E. 454, 46 Am. St. 315, 29 L. R. A. 79; *Ex parte Whitwell,* 98 Cal. 73, 32 Pac. 870, 35 Am. St. 152, 19 L. R. A. 727; *Iler v. Ross,* 64 Neb. 710, 90 N. W. 869, 97 Am. St. 676, 57 L. R. A. 895; *Young v. Commonwealth,* 101 Va. 853, 45 S. E. 327; *Hong Wah,* 82 Fed. 623; *Allgeyer v. Louisiana,* 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832; *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385; *Stockdealers Cases,* Fed. Cas. No. 8,408; *Soon Hing v. Crowley,* 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145; *Lochner v. New York,* 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937; *Minnesota v. Barber,* 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 455.

*Kenneth Mackintosh* and *John B. Hart,* for respondent, to the point that the act was a proper exercise of the police power, cited: *Singer v. State* 72 Md. 464, 19 Atl. 1044, 8 L. R. A. 551; *State v. Buchanan,* 29 Wash. 602, 70 Pac. 52; *State v. Sharpless,* 31 Wash. 191, 71 Pac. 737; *State v. Carey,* 4 Wash. 424, 30 Pac. 729; *State ex rel. Smith v. Dental Examiners,* 31 Wash. 492, 72 Pac. 110; 22 Am. & Eng. Ency. Law (2d ed.), pp. 931-938; *State ex rel. Chapel v. Justus,* 90 Minn. 474, 97 N. W. 124; *State v. Gardner,* 58 Ohio St. 599, 51 N. E. 136, 65 Am. St. 785; *State ex rel. Winkler v. Benzenberg* 101 Wis. 172, 76 N. W. 345; *People ex rel. Nechamcus v. Warden of City Prison,* 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718; *Schnaier v. Navarre Hotel etc. Co.,* 182 N. Y. 83, 74 N. E. 561. The legislature could limit the operation of the act to cities of ten thousand inhabitants. *State v. Sharpless,* 31 Wash. 191, 71 Pac. 737; *State v. Vance,* 29 Wash. 435, 70 Pac. 34; *Redford v. Spokane Street R. Co.,* 15 Wash. 419, 46 Pac. 650; *Fitch v. Applegate,* 24 Wash. 25, 64 Pac. 147; *McDaniels. v. Connelly Shoe Co.* 30 Wash. 549, 71 Pac. 37, 60 L. R. A. 947;

*Ex parte Camp,* 38 Wash. 393, 80 Pac. 547; *Garfinkle v. Sullivan,* 37 Wash. 650, 80 Pac. 188; *Henry v. Thurston County,* 31 Wash. 638, 72 Pac. 488; *Dent v. West Virginia,* 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623; *Barbier v. Connolly,* 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; *Hayes v. Missouri,* 120 U. S. 68, 7 Sup. Ct. 350, 30 L. Ed. 578; *Soon Hing v. Crowley,* 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145; *Ex parte Lucas,* 160 Mo. 218, 61 S. W. 218, *State v. Tower,* 185 Mo. 79, 84 S. W. 10; *Murphy v. State,* 114 Tenn. 531, 86 S. W. 711; *Van Cleve v. Passaic Valley Sewerage Com'rs* (N. J.), 58 Atl. 571; *Brown's Case,* 173 Mass. 498, 53 N. E. 998.

RUDKIN, J.—The appellant was convicted before one of the justices of the peace of King county of the crime of engaging in the business of plumbing as a journeyman plumber, in violation of Section 12 of the Act of March 4, 1905, Laws 1905, p. 126, entitled, "An act to regulate plumbing in cities having a population of ten thousand inhabitants or over, providing for the licensing of persons to carry on the business and work of plumbing, creating a board of plumbing examiners, fixing the compensation of plumbing examiners, providing a penalty for the violation hereof and repealing all acts in conflict herewith," without first having obtained a license so to do, as prescribed by the preceding section of said act, and was sentenced to pay a fine of $15, and costs of prosecution. He was committed to the custody of respondent, as sheriff of King county, in execution of this sentence, and applied to this court for a writ of habeas corpus, on the ground that the restraint and imprisonment were illegal: (1) Because said act violates section 1 of article 14 of the Amendments to the Constitution of the United States; (2) because said act violates sections 3 and 12, of article 1 of the Constitution of the state of Washington; and (3) because said act is an unlawful delegation of legislative power.

The case is now before us on the application and return to the show cause order heretofore granted.

The power of the legislature to make all needful rules and regulations for the health, comfort, and well-being of society cannot be questioned, but there are certain limits beyond which the legislature cannot go, without trenching upon liberty and property rights which are safeguarded by the state and Federal constitutions. As said by the court in *In re Jacobs,* 98 N. Y. 98, 50 Am. Rep. 636,

"The limit of the power cannot be accurately defined, and the courts have not been able or willing definitely to circumscribe it. But the power, however broad and extensive, is not above the Constitution. . . . Generally it is for the legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended, convenient and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property cannot be arbitrarily invaded."

And in *In re Aubrey,* 36 Wash. 308, 78 Pac. 900, this court said:

"It may be stated, as a general principle of law, that it is the province of the legislature to determine whether the conditions exist which warrant the exercise of this power; but the question, what are the subjects of its exercise, is clearly a judicial question. One may be deprived of his liberty, and his constitutional rights thereto may be violated, without the actual imprisonment or restraint of his person. 'Liberty' in its broad sense, as understood in this country, means the right, not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work when he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. All laws, therefore, which impair or trammel these rights—which limit him in his choice of a trade or profession—are infringements upon his fundamental rights of liberty, which are under constitutional protection."

Acts of simlar import but relating to different professions, trades, and occupations have often been before this court. Thus, in *State v. Carey,* 4 Wash. 424, 30 Pac. 729, an act regulating the practice of medicine and surgery was sustained. In *State ex rel. Smith v. Board of Dental Examiners,* 31 Wash. 492, 72 Pac. 110, and in *In re Thompson,* 36 Wash. 377, 78 Pac. 899, a similar act regulating the practice of dentistry was upheld. In *State v. Sharpless,* 31 Wash. 191, 71 Pac. 737, involving the validity of the act regulating the business of barbering, a similar ruling was made. But, in *In re Aubrey, supra,* an act regulating the business of horseshoeing was declared unconstitutional, and without the police power of the state. Some of the acts considered in the above cases were manifestly needful and proper for the protection of the public health, others were on the border line.

Acts similar to the one now before us have been before the courts of last resort in a number of states. In *Singer v. State,* 72 Md. 464, 19 Atl. 1044, 8 L. R. A. 551, the court of appeals of Maryland, held that an act regulating the business of plumbing was a valid police regulation. In *State v. Gardner,* 58 Ohio St. 599, 51 N. E. 136, 65 Am. St. 785, 41 L. R. A. 689, the supreme court of Ohio held that the business of plumbing was a proper subject for police regulation, but the Ohio act was declared unconstitutional because it discriminated between individuals, and firms and corporations. In *State ex rel. Winkler v. Benzenberg,* 101 Wis. 172, 76 N. W. 345, the supreme court of Wisconsin made a similar ruling. In *State ex rel. Chapel v. Justus,* 90 Minn. 474, 97 N. W. 124, the supreme court of Minnesota, held that the business of plumbing was a proper subject for police regulation, but the Minnesota act was declared unconstitutional because its classification was arbitrary and unreasonable. In *People ex rel. Nechamcus v. Warden of City Prison,* 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718, a bare majority of the court of appeals upheld the validity of the plumbing act of that state. The only difference between the New York

act and our own lies in the fact that the former applied to
employing or master plumbers only, while the latter includes
journeymen plumbers as well. No importance was attached
to this omission or difference, however, in either the majority
or dissenting opinion. Indeed the objection could only go
to the efficacy of the law, and not to its validity; for if the
subject can be regulated in its entirety, it can be regulated in
part. The majority opinion concedes "that the act skirts
pretty closely that border line beyond which legislation ceases
to be within the powers conferred by the people of the state,
through the constitution, upon its legislative body." In his
dissenting opinion, concurred in by two of the other justices,
Mr. Justice Peckham said:

"It is said this is proper and right in order that the public
may have some assurance that the master or employing
plumber is not alone capable of following his trade as such,
but that he has sufficient knowledge of the laws of health as
applicable to plumbing to enable him scientifically to follow
that trade as a master plumber. It is to be observed that the
examination does not necessarily call for any such knowledge.
The act can be complied with, so far as this examination is
concerned, if the applicant has but the most ordinary knowl-
edge of the laws of his trade and the proper way to follow
it practically. It is true the board may demand much more
than that, and much more than was ever necessary to prac-
tically pursue the trade. If such additional knowledge were
exacted it would be in fact adding to the known and ordinary
qualifications necessary to carry on the well-recognized trade
of a plumber, those other and entirely different and much
superior qualifications necessary in one who intended to con-
duct the professional business of a sanitary expert with re-
gard to systems and general plans of plumbing. The legisla-
ture has no power to impose such a condition upon one de-
siring to exercise such a trade. It has, as I believe, no power
to prescribe that an individual who desires to follow the trade
of a plumber shall be possessed of qualifications which do not
naturally pertain to such a calling, and which are only pos-
sessed by persons qualified for the pursuit of a very different
occupation, involving learning and skill of an uncommon
order. The legislature might probably provide for a sani-

tary inspection of plumbing work and thus secure a kind of work, as to its system and sufficiency, which might fairly be said to tend towards the protection of the health of the general public. But the trade of the practical plumber is not one of the learned professions, nor does such a tradesman hold himself out in any manner as an expert in the science of 'sanitation,' nor is any such knowledge expected of him, and this act, when practically enforced, may or may not exact it of him. This board has the very greatest and an entirely arbitrary discretion as to what qualifications it will exact from the applicant. It may make an examination which none but an expert in sanitary knowledge could pass, or it may make the examination entirely perfunctory. Judging from the other features of the act, it will depend upon considerations which are foreign to any question of health as to what kind of examination will be made.

"If the broader and more severe examination is held, or the greater qualification is insisted on, the imposition of such a condition in the case of a workman upon his natural right to work at his ordinary trade renders the act under which such a condition can be imposed unconstitutional. Whether in all cases the condition would be insisted on is immaterial. It is the power to insist upon it under the law which makes the law itself void.

"And yet, if the more severe examination is not made, and the superior qualification exacted, the act is absolutely worthless as a health measure. If it is intended as an act simply to secure the ordinary capacity necessary for the prosecution of the trade of a plumber, it is useless and vexatious, and not a health regulation in any form. If it exact more, it is an improper addition to the qualifications of a simple tradesman. This act permits the greater exaction to be made.

"It seems to me very absurd to treat this statute as one which in any possible manner affects, or which was really intended to affect, the public health. And when it is seen that the work of the master plumber may be performed by journeymen who have been subjected to no official examination, and whose work need not be examined by any one, not even by the master plumber himself, the radical failure of the act to really protect the public health is quite apparent. Sewer gas is dangerous, but exactly how to treat the matter of plumbing in order to run the least danger therefrom, is a

subject for professional learning and skill, except as to the narrow part of the tradesman-plumber, which is to see to it that his pipes do not leak, and that they do not permit the escape of gas. This part is mechanical and easily understood, and is the part which the tradesman performs, and the system, the proper arrangement thereof, and such kindred questions, are for the determination of a more scientific and a more learned body of men.

"The examination provided for by this act, if conducted for the sole purpose of discovering the qualifications of an applicant in regard to those matters which pertain and are germane to the real and practical trade of a plumber, will not have the slightest tendency to discover whether he has also the requisite knowledge to enable him to act as a sanitary expert.

"Taking the act as a whole, it would seem quite apparent that its purpose is to enable the employing plumbers to create a sort of guild or body among themselves, into which none is to be permitted to enter excepting as he may pass an examination, the requisites of which are not stated, and where his success or failure is to be determined by a board of which some of their own number are members. In order to be at liberty to exercise his trade as a master plumber he must pass this examination and become a member of this favored body. It is difficult for me to see the least resemblance to a health regulation in all this.

"I think the act is vicious in its purpose and that it tends directly to the creation and fostering of a monopoly.

"It seems to me most unfortunate that this court should, by a strained construction of the act as a health law, give its sanction to this kind of pernicious legislation. We shut our eyes to the evident purpose of the statute, and by means of maxims well enough in their way, but sadly out of place here, impute a purpose to the legislature which it plainly did not have, and which, if it did have, it has failed to carry out, even conceding that the purpose could be legitimately effected by other means. This measure detracts from the liberty of the citizen acting as a tradesman in his efforts to support himself and his family by the honest practice of a useful trade, and I think no court ought to sanction such legislation unless it tends much more plainly than does this act towards the preservation of the health and comfort of the public."

We have quoted at length from this dissent because a Federal question is involved, and because the views of the learned justice are in accord with our own, and in our opinion are shared by a majority of the supreme court of the United States of which he is now a member. In *People v. Lochner,* 177 N. Y. 145, 69 N. E. 373, an act forbidding the employment of bakers in biscuit, bread or cake bakeries, or in confectionery establishments for more than sixty hours in any one week, came before the court for consideration. A bare majority of the court again sustained the act, the two justices, who concurred in the above dissent of Mr. Justice Peckham, dissenting. The case came before the supreme court of the United States on writ of error, and the act was declared unconstitutional and the judgment reversed, Mr. Justice Peckham delivering the opinion of the court. In the course of his opinion the learned Justice said:

"There must be more than the mere fact of the possible existence of some small amount of unhealthiness to warrant legislative interference with liberty. It is unfortunately true that labor, even in any department may possibly carry with it the seeds of unhealthiness. But are we all, on that account, at the mercy of legislative majorities? A printer, a tinsmith, a locksmith, a carpenter, a cabinetmaker, a dry goods clerk, a bank's, a lawyer's or a physician's clerk, or a clerk in almost any kind of business, would all come under the power of the legislature, on this assumption. No trade, no occupation, no mode of earning one's living, could escape this all-pervading power, and the acts of the legislature in limiting the hours of labor in all employments would be valid, although such limitation might seriously cripple the ability of the laborer to support himself and his family."

Again,

"It is impossible for us to shut our eyes to the fact that many of the laws of this character, while passed under what is claimed to be the police power for the purpose of protecting the public health or welfare, are in reality, passed from other motives. We are justified in saying so when, from the character of the law and the subject upon which it legislates, it

is apparent that the public health or welfare bears but the most remote relation to the law. The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose. . . . The court looks beyond the mere letter of the law in such cases." *Lochner v. New York,* 198 U. S. 45, 25 Sup. Ct. 531, 49 L. Ed. 937.

In his concurring opinion in *Butchers' Union etc. Co. v. Crescent City Live-Stock etc. Co.,* 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585, Mr. Justice Bradley said:

"The right to follow any of the common occupations of life is an inalienable right; it was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which commenced with the fundamental proposition that 'all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and *the pursuit of happiness.'* This right is a large ingredient in the civil liberty of the citizen."

Again,

"I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States."

And again,

"But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it—it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen."

It is true these remarks were made in regard to questions of monopoly—questions not entirely foreign to this case—but they well describe the rights which are covered by the word "liberty" as contained in the Fourteenth Amendment.

We cannot close our eyes to the fact that legislation of this kind is on the increase. Like begets like, and every legislative session brings forth some new act in the interest of some new trade or occupation. The doctor, the lawyer, the druggist, the dentist, the barber, the horseshoer, and the plumber have already received favorable consideration at the hands of our legislature, and the end is not yet, for the nurse and the undertaker are knocking at the door. It will not do to say that any occupation which may remotely affect the public health is subject to this kind of regulation and control. Our health, our comfort, and our well-being are materially affected by all of our surroundings—by the houses we live in, the clothes we wear, and the food we eat. The safety of the traveling public depends in no small degree on the skill and capacity of the section crews that build and repair our railroads; yet are we on this account to add the architect, the carpenter, the tailor, the shoemaker, those who produce and prepare our food, and all the rest, to the ever growing list? If so, it will be but a short time before a man cannot engage in honest toil to earn his daily bread, without first purchasing a license or permit from some board or commission. The public health is entitled to consideration at the hands of the legislative department of the government, but it must be remembered that liberty does not occupy a secondary place in our fundamental law. Under some of the acts to which we have referred members of the board of health form part of the examining board, but our act has not even this saving grace. By its terms two master plumbers and one journeyman plumber are constituted the guardians of the public health and welfare. We are not permitted to inquire into the motive of the legislature, and yet, why should a court blindly declare that the public health is involved, when all the rest of mankind know full well that the control of the plumbing business by the board and its licensees is the sole end in view. We are satisfied that the act has no such relation to the public health as will sustain it as a police or sani-

tary measure, and that its interference with the liberty of the citizen brings it in direct conflict with the constitution of the United States.

The prisoner is entitled to his discharge, and it is so ordered.

Mount, C. J., Dunbar, Fullerton, Hadley, and Crow, JJ., concur.

Root, J. (concurring)—To the foregoing may be added this thought: The liberty and natural rights of a citizen—such as his privilege to engage in a lawful vocation for a livelihood—can be denied him by the legislature only where such deprivation is *necessary* to accomplish a given result essential to the welfare of the public. If that result can be attained in a practicable manner without interference with such liberty and rights, there is an absence of that necessity which is an essential and prerequisite to the validity of such a statute.

In the case at bar, the only justification urged in behalf of the statute is that good plumbing is necessary to the health of people in cities having over ten thousand inhabitants. Avowedly, it is sought to insure good plumbing by means of this statute. It is self-evident that the same or a better result can be obtained by means of statutes or ordinances requiring good plumbing, and insuring it by means of adequate inspection. Such a statute or ordinance would not interfere with the liberty or natural rights of any person, and would safeguard the health of the public as fully as, or more so than, the statute now in question. It therefore follows that the liberty and natural rights of the individual are infringed by this statute unnecessarily and, consequently, unconstitutionally.