[No. 28403. *En Banc.* February 8, 1943.]

MARJORIE WEISS *et al., Appellants,* v. SWEDISH HOSPITAL, *Respondent.*[1]

[1]Reported in 133 P. (2d) 978.

*Frank Harrington* and *Wright & Wright,* for appellants.

*J. Speed Smith* and *Henry Elliott, Jr.,* for respondent.

ROBINSON, J.—On December 26, 1938, Marjorie Weiss, an expectant mother, was admitted to the Swedish hospital. Two days thereafter, her physician was summoned, and she was taken to the delivery room. The delivery room was in charge of Mrs. Fite, who had seven other nurses under her supervision. Mrs. Fite completed her training course at the Swedish hospital in 1930. For four years thereafter, she was employed as night supervisor of its delivery room. For nearly four years after that, she practiced her profession as a private nurse, principally in obstetrical cases. For some months prior to December, 1938, she had been reemployed by the hospital as day superintendent of its delivery room. The evidence shows conclusively that her general qualifications for that employment were of a high order.

Mrs. Fite followed the usual practice. When the patient began to have birth pains, she summoned her physician, took her to the delivery room, placed her on the delivery table, and strapped her wrists. She began giving the appellant ether to keep her in labor

and relieve her pain. Shortly, she found it necessary to leave the room temporarily. She described the occasion in these words:

"The patient in the next room was progressing and was nearly ready to deliver and I had to go in there to get things organized in the next room, to start the delivery."

She, accordingly, summoned Dr. Olsson, an interne, to care for Mrs. Weiss, and went to the other room to attend to her supervisory duties, instructing Dr. Olsson to continue the administration of the anesthetic, as circumstances might require. Shortly thereafter, Dr. Olsson found that the ether container was nearly empty, and, the patient being quiet, turned to get another can of ether from a row of shelves behind him. While doing so, the patient pulled her hands out of the straps, and, as Dr. Olsson turned from the shelves, she was sliding off the farther side of the table. Mrs. Fite heard the noise of the fall, and, rushing in, assisted in replacing Mrs. Weiss on the table. On several occasions before her delivery, which was successfully accomplished about forty-five minutes later, Mrs. Weiss pulled her hands out of the straps, even though they were snugly fitted. How this could happen is best shown by the evidence of Colonel Sayer, who had given Mrs. Weiss twenty-five treatments after her injury, who had supervised the taking of moving pictures of Mrs. Weiss for use at the trial, and who had been the family physician and had known her, as he expressed it, "since she was a wee tot." While under examination by her attorney, he testified, in part, as follows:

"Q. Have you at any time had occasion to examine the hands of the plaintiff wife, Marjorie Weiss? A. I have seen them many times. I have never made any particular examination of them. Q. Would you say from your experience and observation of her

hands, and such observation as you have made of other patients, there is anything extraordinary or unusual about her hands?  A.  I can look at them right now.  Q.  Will you look at them?  (Witness examines Marjorie Weiss' hands before jury)  A. She has a long narrow hand not much bigger than her wrist. Q.  Is that type of hand something that we do not find often in a woman?  A.  Oh, quite often.  Q.  You find it quite often?  A.  Yes, sir."

Mrs. Fite testified, in substance, that she fitted the wrist straps snugly, but without making any particular examination of the patient's hands, never having observed or heard of a patient with hands so slender that they could be drawn through snugly fitted wrist straps.

Mrs. Weiss suffered no fracture, but two days after her fall her right shoulder began to ache, and it was then discovered that her scapula was thrown out of its proper position and that her right arm was partially paralyzed on account of some injury to a nerve. At the time of the trial, which was held nearly two years after the accident, she had made a fair recovery, although the scapula was not entirely in place and her arm tired after a little use.

Without repeating the evidence so showing, we find that due care was used by the respondent in investigating Dr. Olsson's record and qualifications before employing him as an interne, and his competency while in the respondent's employ is shown.  The only substantial dispute in the evidence concerns the length of time Mrs. Fite had been out of the room before Mrs. Weiss fell from the table.  At the trial, she testified that it was not more than two or three minutes. She appears to have testified, while giving a deposition more than a year before, that it was ten or fifteen minutes.  There is no other evidence covering that matter.

450

■ It has long been the law of this state that, even if paying for the service (as Mrs. Weiss was doing), one cannot recover with respect to an injury suffered through the negligence of a servant of a charitable corporation in performing that service, unless the corporation be found not to have exercised due care in employing that servant or unless the circumstances show some kind of administrative negligence.

■ If Mrs. Weiss was injured as the result of an act of negligence, it must have been some act of Mrs. Fite or Dr. Olsson (since they were the only actors), or by some kind of administrative negligence. But due care was shown in the selection of Mrs. Fite and Dr. Olsson, and we find no evidence tending to show administrative negligence. In this connection, it is urged, in appellant's brief, that the jury would be warranted in inferring that Dr. Olsson was compelled to leave the delivery room to procure additional ether. In so stating, counsel overlooks the positive and undisputed evidence of Mrs. Fite, appearing on page 21 of the statement of facts, and of Dr. Olsson, at page 138, that the ether was secured from shelves immediately behind him and but a few feet from the delivery table.

■ We held in the case of *Magnuson v. Swedish Hospital*, 99 Wash. 399, 169 Pac. 828, a case decided in 1918, that the respondent in this case was at that time a charitable corporation. Evidence in this case shows that it still operates under the same articles and in accordance with the same nonprofit plan as was set forth at some length in the opinion in that case and therefore need not be repeated here.

There is additional evidence in this record to the effect that respondent now maintains a well-equipped cancer clinic in which every case of cancer which may appear curable, including all United States marine hos-

pital cases, is received for treatment whether the patient is able to pay or not; also, that in 1937 the Swedish hospital took care of 110 free patients and 226 part-pay patients, in 1938, 94 free patients and 255 part-pay patients, in 1939, 81 free patients and 368 part-pay patients. This does not include "bad debt" patients or free treatment of out-patients in the cancer clinic. The cost of the free treatment of out-patients was as follows: 1937, $5,222; 1938, $2,957.50; 1939, $5,520.

■ Without doing any free work of any kind, the Swedish hospital would still be a charitable corporation so long as its surplus income is applied to the support, maintenance, and enlargement of the hospital and its facilities. The evidence is that it has always followed this policy, and, in the exercise thereof, starting with a modest amount of money loaned by public spirited citizens, has built up a plant with a value in excess of a million and a quarter dollars. It is a charitable corporation because all of its earnings are devoted to providing care for the sick and afflicted or in the construction of additions and improvements to enlarge its usefulness. Its surplus income has invariably been applied to the improvement and building up of its facilities. Some of the great religious sisterhoods, in following the same policy, have built, and maintain, extensive chains of such hospitals. In so doing, they have not lost their legal classification as charitable institutions. Whether or not they charge for their services is not the test. It is the character of their work, plus the fact that all earnings are employed in extending and improving their facilities which gives them, in law, their charitable classification.

■ There is evidence in the record to the effect that certain of the trustees of the respondent hospital have sold it goods and services. One, an experienced building contractor, received fees for supervising the con-

struction of some of its buildings. Another furnished it lumber at the going price. Another supplied its needs for milk and other food products for a period of years. Still another did its laundry work for a considerable period. There were one or two other instances in which trustees of the hospital had business transactions with it. The appellants contend that all such dealings constituted breaches of trust, relying upon *Meinhard v. Salmon*, 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1, and, citing *Hamilton v. Corvallis General Hospital Ass'n*, 146 Ore. 168, 30 P. (2d) 9, further contend that this class of evidence should have carried the case to the jury, and requires that this court should now grant a new trial.

If these dealings constituted breaches of trust, they were of the most technical kind. There is no evidence that a trustee received anything more than a normal business profit in any of these transactions. There is evidence that some of the services involved were furnished at much less than the going rate. There is no evidence which indicates that the work of the hospital was cut down or that its expansion and upbuilding was delayed or otherwise adversely affected by any of these transactions. In our opinion, the evidence in regard to these matters raised no jury question as to whether or not the respondent hospital is, in the legal sense, a charitable institution. That question was for the court, and we agree that it correctly found the respondent hospital to be a charitable corporation, within the meaning of the rule under discussion.

Since we find that the respondent is a charitable corporation, that no administrative negligence is shown, and that those of its servants who were alleged to have been guilty of negligence (if, indeed, any negligence was shown), were selected with due care, we must affirm the judgment of dismissal entered by the

trial court, unless we depart from the long-settled rule hereinbefore stated. Appellants strenuously urge that we now do so, and have supported their position by extensive argument, both oral and in writing.

In *Miller v. Sisters of St. Francis*, 5 Wn. (2d) 204, 105 P. (2d) 32, a case involving a most distressing permanent injury to a newborn baby, through the negligence of a nurse, and in which the immunity rule was applied, at least two of the members of this court expressed a view that the rule exempting charitable corporations from tort liability should be abandoned, citing recent decisions from other courts and numerous articles from the law reviews. In the interest of brevity, we shall not include herein the numerous decisions cited by the appellants in their briefs. These briefs will remain available in our library and in a number of other law libraries throughout the state.

Besides, we think that all of the pertinent American cases, as well as all articles on the subject, published up to early in the current year, are contained in the footnotes to a case decided by the circuit court of appeals for the District of Columbia on last June 30th. *President and Directors of Georgetown College v. Hughes*, 130 F. (2d) 810, 7 Negligence Cases, 936. In this case, the court, after stating that the question was an open one in that jurisdiction, minutely examines the historical background of the rule, and, appending, in footnotes, an almost incredible number of illustrative citations, surveys the state of the rule and its modifications as shown in the decisions of the various states, the whole furnishing, whether one agrees with its conclusions or not, the most powerful attack on the rule which may be found in print, and at the same time a most complete and up-to-date bibliography of the subject.

In some of the states, at least five, the nonliability of a charitable corporation for tort is absolute, and in a half dozen others, substantially so. On the other hand, in several states, their liability is unqualified. Between these extremes there are all sorts of qualified rules. In some states, the rule of nonliability does not apply as against strangers; in some, not against persons who pay for the service rendered; in others, as in our own, the rule of nonliability is not applied if the claimant was injured by a servant who was negligently employed. In some, including our own, there is no immunity as to administrative negligence; in others, that exception is not recognized. These do not by any means exhaust the variations of the rule, as applied in American law. In a few states, there are statutes dealing with the subject. These, though less in number, are no more uniform than the case law, and, as pointed out in *President and Directors of Georgetown College v. Hughes, supra,* the decisions run the gamut from full immunity to general responsibility. Broadly speaking, more of the states adhere to the rule we have followed than to any other.

When we consider the great diversity of variant rules which might be adopted, and at the same time remember that the rule with which we are dealing does not apply to hospitals alone but to churches, educational institutions, Y. M. C. A.'s, social welfare organizations, and, in general, to the various organizations engaged in philanthropic, benevolent, and charitable work, it is at once manifest that a change in the rule, particularly its complete abandonment, would have far-reaching and, perhaps, unimagined and unintended consequences. Furthermore, the hospitals are almost our only existing training schools for nurses. Of our desperate needs in this regard we have just been forcibly reminded by the recent arrival at Seattle

of nearly five hundred wounded men from but one of our many far-flung battle fronts.

In the case of *Canney v. Sisters of Charity of the House of Providence,* 15 Wn. (2d) 325, 130 P. (2d) 899, decided less than three months ago, five of the judges of this court, sitting as department one, rejected the same contention which the appellants here so strongly urge. The court has heard the instant case *En Banc,* and, after a careful consideration of the matter, it concludes that it should not abandon, or modify, the limited liability rule which it has so long held applicable in cases of this character. Accordingly, the judgment appealed from is affirmed.

SIMPSON, C. J., BEALS, STEINERT, JEFFERS, MALLERY, and GRADY, JJ., concur.

MILLARD, J. (dissenting)—The author of the majority opinion in the case at bar stated, in a concurring opinion in *Miller v. Sisters of St. Francis,* 5 Wn. (2d) 204, 105 P. (2d) 32, that

"I have come to believe that the rule of tort nonliability of so-called charitable institutions has become an anachronism and should be no longer enforced. The only consideration that would cause me to hesitate is that so important a change in our established law ought ordinarily be made by the legislature rather than by the courts. I note, however, that, although this reason was strongly urged by a dissenting justice, it did not deter the supreme court of California from recently abandoning the rule in a case decided some months after our opinion on the first appeal was rendered. *Silva v. Providence Hospital of Oakland,* 14 Cal. (2d) 762, 97 P. (2d) 798. I further note that, in a discussion of a similar case in 38 Columbia Law Review, 1485, 1489, it is logically contended that, since the rule was created by the courts, it may properly be modified or abandoned by them. Courts, however, rightly hesitate to make major changes in the law without some sort of advance warning or notice.

"It would serve no useful purpose to here set out the reasons why the rule should be abandoned. I think it appropriate, however, to call the attention of the administrative officers of hospitals and other charitable institutions to the fact that the trend in that direction has become very strong, and that it is rapidly increasing in momentum. As indicative of this, I cite the following: *Sheehan v. North Country Community Hospital* (1937), 273 N. Y. 163, 7 N. E. (2d) 28, 109 A. L. R. 1197; 38 Columbia Law Review (1938), 1485; the *Silva* case, *supra*, decided in January, 1940, and comments on the nonliability rule appearing independently in the May 1940 issues of three of our law reviews, to wit: 28 California Law Review, 530; 26 Virginia Law Review, 951; and 1 Washington and Lee Law Review, 257. The next generation of judges will surely abandon the rule if we do not."

It is not a sound basis for the majority opinion that, because in this war period there is a dearth of competent nurses, one is lacking in patriotism or less loyal to his country if he insist that the courts abandon "an anachronism" which "should be no longer enforced" and which "the next generation of judges will abandon if we do not." The second reason—refusal of this court to now concur in the concurring opinion in *Miller v. Sisters of St. Francis, supra*—for continuance of the rule of tort nonliability of so-called charitable institutions, is not a valid excuse for refusal of one to register an honest conviction contrary to the views of a majority. The question is: Should the rule be abandoned? If so, one would stand self-accused if his excuses for concurrence in the majority opinion were the two reasons advanced by the majority.

The rule to which the majority subscribes was judicially promulgated; hence may, and should, be judicially abrogated. The reasons are as clear, cogent, and convincing today for such abrogation as when

the concurring opinion in *Miller v. Sisters of St. Francis, supra,* was written.

It is unnecessary to cite and review each of our numerous opinions which overruled other opinions of this court and enunciated rules deemed more consonant with justice than the prior rules which had been followed many years. Three of the cases in which we announced a rule contrary to precedent and against the so-called weight of authority are the following:

In *Tacoma v. Fox,* 158 Wash. 325, 290 Pac. 1010, we overruled *State ex rel. Richey v. Smith,* 42 Wash. 237, 84 Pac. 851, 114 Am. St. 114, 7 Ann. Cas. 577, 5 L. R. A. (N. S.) 674 (written a quarter of a century earlier), and held that a city ordinance which prohibited engaging in the trade of a journeyman plumber without first obtaining a license upon establishing competency before an examining board, is within the police power of the city as a regulation for the preservation of the health and welfare of the public.

In *Parrish v. West Coast Hotel Co.,* 185 Wash. 581, 55 P. (2d) 1083, 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578, we sustained the constitutionality of Laws of 1913, chapter 174, fixing a minimum wage for women and children, despite the United States supreme court's declaration that such statutes were invalid as they authorized an unconstitutional interference with the freedom of contract.

In *Powell v. Superior Portland Cement, Inc.,* 15 Wn. (2d) 14, 129 P. (2d) 536, we overruled our prior opinions and, contrary to the so-called weight of authority, held that one who purchases property in an industrial community is not entitled to compensation because of dust inseparable from industrial activity in that community.

The legislature of this state adjourned its twenty-seventh regular session March 13, 1941, which was one month prior to filing in this court of the transcript in the case at bar. In August, 1941, this case was assigned for hearing, and was heard, September 11, 1941, by a department of this court and assigned for opinion. In October, 1942, one of the judges of that department died and another judge of the department disagreed with the majority view; this necessitated hearing the case in January, 1943, by the court sitting *En Banc*. It is now January 25, 1943. It would be unconscionable for me to contribute to further delay of a decision in this cause which has been in the courts two years. I am in accord with the argument in the brief of counsel for appellants, but it would be of no avail, in view of this court's refusal to abrogate the rule, to again attempt to challenge attention to "an anachronism" which "should be no longer enforced." The opinion should be filed in time to afford an opportunity to the legislature, which will adjourn March 11, 1943, to consider the question.

In *Canney v. Sisters of Charity*, 15 Wn. (2d) 325, 130 P. (2d) 899, the plaintiffs failed to sustain the burden of proof.

The judgment should be reversed.

BLAKE, J. (dissenting)—I dissent. I think the immunity doctrine, as applied to hospitals, has long since ceased to be justifiable. The court, having adopted it, may, and should, reject it without waiting for legislative action.