(96 App. Div. 383.)

PEOPLE v. BEATTIE.

(Supreme Court, Appellate Division, First Department. July 13, 1904.)

1. CONSTITUTIONAL LAW—STATUTES—HORSESHOERS—REGULATION OF BUSINESS —PUBLIC POLICY.
    Laws 1897, pp. 498, 499, c. 415, §§ 180, 184, regulating the business of horseshoeing, and requiring a person practicing such business to be examined, and to obtain a certificate from a board of examiners and file the same with the county clerk where the person proposes to practice such trade, is not a valid exercise of the state's police power.

2. SAME—DUE PROCESS OF LAW.
    Such act is unconstitutional, as an arbitrary interference with personal liberty and private property without due process of law.

Appeal from Court of Special Sessions, New York County.

Samuel Beattie was convicted of violating Pen. Code, § 384m, for practicing the business of a master or journeyman horseshoer without filing a certificate issued by the board of examiners, and he appeals. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, PATTERSON, and O'BRIEN, JJ.

Carlos C. Alden, for appellant.
Robert C. Johnstone, for the People.

89 N.Y.S.—13

HATCH, J. The defendant demurred to the sufficiency of the information charging him with the commission of a violation of section 384m of the Penal Code. The demurrer rested upon the ground that the statute upon which the information was based contravenes the fourteenth amendment of the Constitution of the United States, in that it abridges privileges and immunities of a citizen of the United States, and deprives him of liberty and property without due process of law, and denies the equal protection of the law; also that the statute contravenes the Constitution of the state of New York, in that it deprives a citizen of liberty and property without due process of law, and imposes upon citizens of this state restraints in following a common and lawful occupation, the right to prosecute which is secured by the Constitution. The demurrer was disallowed, and a trial had, when the defendant pleaded guilty to a violation of the statute in question, but moved in arrest of judgment thereon that the facts stated did not constitute a crime. The court denied the motion, adjudged the defendant guilty, and imposed a fine of $5. From the judgment of conviction, the defendant appeals to this court.

By the provisions of article 12 of the labor law, being sections 180, 184, c. 415, pp. 498, 499, Laws 1897, provision is made for a board of examiners to examine applicants desiring to practice as master or journeymen horseshoers, and, if found qualified, the board is required to issue to the applicant a certificate showing that he is qualified to practice as a master or journeyman horseshoer. Such certificate is required to be registered with the clerk of the county where the person proposes to practice such trade. No person shall practice horseshoeing as a master or journeyman horseshoer unless he is registered and has a certificate as provided in the act. The article is limited in its application to cities of the first and second classes. By an amendment (chapter 558, p. 1145, Laws 1899) the application of the article was extended to all cities of the state. The act was again amended by chapter 151, p. 352, of the Laws of 1903. The effect of the last amendment will be hereafter noticed. The provision of section 384m of the Penal Code provides:

"A person who presents to the county clerk, for the purposes of registration, a certificate purporting to qualify him to practice horseshoeing in a city of the first or second class, which has been fraudulently obtained, or practices as a horseshoer in any such city without complying with the provisions of article twelve of the labor law, or violates or neglects to comply with any of such provisions, is guilty of a misdemeanor."

The particular question which this appeal presents is whether the regulation of the subject of horseshoeing falls within the authority of the state, under the exercise of the police power. It is claimed by the appellant that in fact it restrains persons from pursuing a lawful occupation and a common trade, and that it does not fall within any of the subjects to which the right of regulation under the police power applies. It is now common learning that the police power which may be exercised by the state is very broad and comprehensive in its scope. Yet, however broad and comprehensive it may be, it has its limitations, and must, in its exercise, have relation to the promotion of the health, comfort, safety, and welfare of society. If it does not fairly relate

to some one of these objects, and tend to promote the public weal in connection therewith, it does not come within the lawful right of the state to exercise the power. Under ,the guise of the police power a subject may not be regulated, when in fact it does not promote or tend to promote some one of the objects embraced within its scope. It was said by Judge Cooley, in speaking of the power of the Legislature to regulate these subjects, having application to corporations holding inviolable charters:

"The limit to the exercise of the police power in these cases must be this: The regulations must have reference to the comfort, safety, and welfare of society; they must not be in conflict with any of the provisions of the charter; and they must not, under pretense of regulation, take from the corporation any of the essential rights and privileges which the charter confers. In either they must be police regulations in fact, and not amendments of the charter in cur-tailment of the corporate franchise."

In Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585, it was said by Mr. Justice Field, in speaking of the inalienable rights which were proclaimed in the Declaration of Independence:

It "is the right of men to pursue any lawful business or vocation in any manner not inconsistent with the equal rights of others, which may increase their property or develop their faculties, so as to give to them their highest enjoyment. The common business and callings of life—the ordinary trades and pursuits, which are innocent in themselves, and have been followed in all communities from time immemorial—must therefore be free in this country to all ·alike upon the same terms. The right to pursue them without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright."

Mr. Justice Bradley, in the same case, said:

"I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States."

These declarations and many others were collated and approved in Matter of Application of Jacobs, 98 N. Y. 98, 50 Am. Rep. 636, and the learned judge who wrote therein said:

"So, too, one may be deprived of his liberty, and his constitutional rights thereto violated, without the actual imprisonment or restraint of his person. 'Liberty,' in its broad sense, as understood in this country, means the right not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. All laws, therefore, which impair or trammel these rights —which limit one in his choice of a trade or profession—* * * are infringements upon his fundamental rights of liberty, which are under constitutional protection."

These rules have been accepted by all courts throughout the length and breadth of this land as containing a sound interpretation of the constitutional guaranty relating to this subject. They have direct and pertinent application to the case in hand, and furnish a controlling guide in determining whether the present case falls within or without the pale of the police power.

It is difficult, indeed, to see how the regulation of shoeing horses has any tendency to promote the health, comfort, safety, and welfare of so-

ciety. This language is used in respect to persons. It certainly cannot be said that it affects the health of the individual to regulate the subject either of the general public, or of the persons who follow it as an occupation; and, if the latter were in any wise injuriously affected by the process of shoeing horses, the attempted regulation, it is clear, would not affect or have any influence upon such subject. The law cannot, therefore, be sustained as being in any just sense a regulation for the promotion of the public health, or of the health or morals of the class of persons who follow it as a trade. Nor is it apparent how in any wise a regulation of this subject will tend to promote the comfort of the people. It is not suggested how such result will be accomplished, or how the safety and welfare of society will be in any wise promoted or affected by it. It does not seem, therefore, that this regulation tends to promote the public weal along any of the lines upon which the exercise of the police power in various cases which have arisen have been made to rest. In Bessette v. People, 193 Ill. 334, 62 N. E. 215, 56 L. R. A. 558, the court had under consideration a statute in all respects similar to the present one, and it was there held that the act was unconstitutional by reason of its interference with the liberty of the citizen; the court saying:

"It is impossible to conceive how the health, comfort, safety, or welfare of society is to be promoted by requiring a horseshoer to practice the business of horseshoeing for four years, and submit to an examination by a board of examiners, and pay a license fee, for the privilege of exercising his calling. The ends to be secured by the exercise of the police power are the public health, comfort, safety, or welfare, but this measure has no relation to the ends thus specified. If this act is valid, then the Legislature of the state can regulate almost any employment of the citizen by the requirement of previous study and previous examination, and the payment of a license fee, and the issuance of a license. While we are always reluctant to put the stamp of invalidity upon any act of the legislative branch of the government, it is yet our duty, in the exercise of the trust imposed upon us by the Constitution, to protect the constitutional rights and privileges of the individual citizen against such an invasion of them as is embodied in the present enactment."

So far as authority goes, that case is an actual decision by the Supreme Court of Illinois of this subject, and, while not binding upon us as an authority, yet we concur in the reasoning which the court took— that, so far as the public is concerned, the act in question bears no relation to the recognized subjects which furnish the basis for the exercise of the police power. This view is supported by much authority. Bertholf v. O'Reilly, 74 N. Y. 509, 30 Am. Rep. 323; Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832; People v. Marx, 99 N. Y. 377, 2 N. E. 29, 52 Am. Rep. 34. The principle is also recognized in the most recent decisions by the Court of Appeals, wherein it is held that this constitutional right can only be made to yield to the necessity in promotion of the welfare, health, or prosperity of the state. People ex rel. Nechamcus v. Warden, 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718; People v. Lochner, 177 N. Y. 145, 69 N. E. 373. The difficulty which is inherent in the exercise of the police power is not in a statement of the principles upon which the exercise of power rests, but it is in the application of those principles to the particular case. It was said by Chief Justice Shaw in Commonwealth v. Alger, 7 Cush.

53, "It is much easier to proceed and realize the assistance and sources of the power, than to mark its limitation or prescribe limits to its exercise." So in all cases the extent to which the power may be legitimately exercised must be left for determination in each case as it arises. Allgeyer v. Louisiana, supra.

It is claimed that this law may be supported as a valid constitutional enactment, and the conviction sustained, upon the ground that it operates in the prevention of cruelty to animals; the claim in this respect being that, as the health and comfort of animals is one of the recognized subjects of legislative control, so, likewise, their health and comfort tend to promote the health, comfort, and welfare of the community, and that the exercise of the police power may be made to rest on broad humanitarian grounds. We are quite willing to concede that the health, comfort, and welfare of animals are so closely linked with these elements in human beings that, in a degree, each may be said to be dependent upon the other in securing such results. Laws prohibiting cruelty to animals, and providing in considerable detail for the exercise of power necessary to secure that result, have found a place upon the statute books and been enforced by the courts for many years. Stage Horse Cases, 15 Abb. Prac. (N. S.) 51. And numerous convictions have been had under such statutes. In Bessette v. People, supra, this view of the case was not considered by the court, and no expression of opinion was made thereon. We do not think that the regulation of horseshoeing bears such relation, in this aspect, to the public health, comfort, and safety of society, as to bring it within the subject upon which the police power may operate. The trade has been followed from time immemorial as one of the well-recognized and common avocations of human life. No such ill results have flowed therefrom as to call for a supervision of the matter by those charged with the enforcement of laws designed to prevent cruelty to animals. Such subject is recognized and provided for in title 16 of the Penal Code. The offenses are classified, and, in enumeration, embrace overdriving; abandonment; failure to provide proper food and drink; selling or offering for sale a disabled animal; carrying animals in a cruel manner; wantonly poisoning; throwing substances injurious to animals in public places; keeping milch cows in unhealthy places, and feeding them unhealthy food; transporting animals for more than 24 consecutive hours; setting on foot fights between them. These acts embrace those cruelties to animals which the experience of mankind has shown to be most common, and where cruelty is usually exhibited. While the definition of cruelty in section 669 of the Penal Code includes every act, omission, or neglect whereby unjustifiable pain, suffering, or death is caused or permitted, and therefore would embrace the infliction of cruelty by any willful means, yet there is no suggestion that the shoeing of horses has resulted in such cruelty, or that the Legislature was ever called upon to take notice of it. Doubtless the shoeing of a horse at times may have produced corns, contracted the feet, and otherwise inflicted pain, but the same thing is true in the shoeing of human beings; and neither the one subject nor the other has ever been deemed to be sufficiently aggravated to call for any notice or comment from the most

humane of mankind which would lead to legislation upon either subject. It is common knowledge that hundreds of kindly and well-disposed people have devoted their lives in promoting the welfare of animals, but it is not made to appear that such persons have felt called upon to interfere with the shoeing of horses, in order to prevent cruelty. We are bound to take cognizance of the fact that for centuries this occupation has been one of the most common of all the trades. It is the first to follow the pioneer as a necessity, and it is recognized as of necessity in all countries and civilized communities, not only here, but throughout the world, wherever the surface over which the animal is used requires protection to its feet. For centuries horses have been shod, and we may take notice that during that period no cruelty has resulted from the act which has caused comment among men, or which has destroyed the usefulness of the animal, or in a substantial sense caused it pain or suffering. Indeed, it may be doubted whether more discomfort, pain, and suffering have not been occasioned by the harness which it wears, and by the food which it eats, than by the shoes which it wears. Under such circumstances, to attribute cruelty to animals by shoeing seems fanciful in the extreme. It may be said with as much foundation for the assertion that, if the shoeing of horses can be considered as cruelty, so, likewise, can their harness, feeding, watering, and cleaning be denominated as cruelty, for certainly as much suffering to the animal flows from such sources. To undertake the regulation of these subjects would inject into the body politic a paternalism which is repugnant to free institutions. Upon this subject nothing can be added to the terse statement of Judge Earl in Matter of Application of Jacobs, supra:

"Under the guise of promoting the public health, the Legislature might as well have banished cigarmaking from all the cities of the state, or confined it to a single city or town, or have placed under a similar ban the trade of a baker, of a tailor, of a shoemaker, of a woodcarver, or of any other of the innocuous trades carried on by artisans in their own homes. The power would have been the same, and its exercise, so far as it concerns fundamental constitutional rights, could have been justified by the same arguments. Such legislation may invade one class of rights to-day, and another to-morrow; and, if it can be sanctioned under the Constitution, while far removed in time, we will not be far away in practical statesmanship, from those ages when governmental prefects supervised the building of houses, the rearing of cattle, the sowing of seed, and the reaping of grain, and governmental ordinances regulated the movements and labor of artisans, the rate of wages, the price of food, the diet and clothing of the people, and a large range of other affairs long since in all civilized lands regarded as outside of governmental functions. Such governmental interferences disturb the normal adjustments of the social fabric, and usually derange the delicate and complicated machinery of industry, and cause a score of ills while attempting the removal of one."

We are of opinion, therefore, that this law arbitrarily interferes with personal liberty and private property without due process of law, for which reason it is invalid.

The case also presents a question rendering doubtful, to say the least, the validity of this conviction. We have already seen that the labor law by chapter 558, p. 1145, of the Laws of 1899, extended the application of article 12 to all cities of the state. By the amendment (chapter 151, p. 352, Laws 1903) which became a law April 8, 1903, this law

was amended "by re-numbering articles twelve and thirteen to be known as articles thirteen and fourteen respectively by inserting therein a new article, to be known as article twelve, and to read as follows." By this amendment, article 12 relates exclusively to the employment of children in street trades, and has no relation whatever to the violation of the provisions of law, the subject of this conviction. By the provisions of section 384m of the Penal Code, it is limited in its application to procuring a certificate and its registration to a city of the first and second classes, and the offense is for fraudulently obtaining such certificate, or practicing as a horseshoer in any such city without complying with the provisions of article 12. It thus clearly appears by this amendment that, for violation of the act outside of cities of the first and second classes, no penalty whatever is provided, while within these cities such act is made a misdemeanor. The act relates to article 12, which, as presently existing, has no application to such subject. While it is doubtless true that punishment may be meted out with more severity in one locality than in another, yet the law which works such a result must apply equally to all the inhabitants of the state. Williams v. People, 24 N. Y. 405. A law is of doubtful validity which creates the same condition in particular parts of the state, but only punishes its violation in two. All laws must operate equally, and where it is apparent, and no reason can be assigned for making the act a crime in one place, and giving the persons immunity for its violation in another, it operates unequally, and is therefore invalid. Without, however, considering this subject in detail, we place our decision upon the ground that the act is unconstitutional.

The judgment of conviction should therefore be reversed, and the defendant discharged. All concur.