[No. 1855]

J. MARYMONT, PETITIONER, *v.* NEVADA STATE BANKING BOARD, DENVER S. DICKERSON, JEWETT W. ADAMS, A. B. WITCHER, S. W. BELFORD AND CHARLES S. SPRAGUE, AS MEMBERS OF THE NEVADA STATE BANKING BOARD, AND M. M. VAN FLEET, AS SECRETARY OF SAID BOARD, RESPONDENTS.

1. BANKS AND BANKING—REGULATION BY STATE.
    Banking and other pursuits may be regulated in the public interest.

2. BANKS AND BANKING—RIGHT TO ENGAGE IN BANKING.
    The business of banking is a lawful business, which it is the inherent right of every citizen to engage in.

3. CONSTITUTIONAL LAW—RIGHT TO ACQUISITION AND PROTECTION OF PROPERTY.
    The constitution (art. 1, sec. 1) asserting that the acquisition and protection of property is an inalienable right, means more than the right to protect property already owned by the citizen.

4. CONSTITUTIONAL LAW—BANKING ACT—RIGHT TO PROPERTY—DUE PROCESS OF LAW.
    The act of March 24, 1909 (Stats. 1908–09, c. 191), the "Banking Act," provided by section 2 that it should be unlawful under penalty for any corporation, partnership, firm, or individual to engage in the banking business except by means of a corporation duly organized for such purpose under the laws of the state. Sections 5 and 6 created a state banking board to have general supervision of banks and banking. Section 12 provided that it should be unlawful to engage in banking without obtaining a license from such board, which license should issue only to corporations duly organized to do a banking business. *Held,* that such act was in conflict with the constitution (art. 1, sec. 8), asserting rights to liberty, property, and happiness; with article 1, section 8, guaranteeing due process of law, and with article 1, section 20, under which rights not enumerated are saved to the people.

ORIGINAL PROCEEDING. Application by J. Marymont for writ of mandate against the Nevada State Banking Board and another. **Writ denied.**

The facts sufficiently appear in the opinion.

*James T. Boyd* for Petitioner:

The entire section in question is absolutely unconstitutional, and is in direct conflict with the federal and state constitutions.

*First*—It attempts to deprive citizens, now engaged in the banking business, of their property without due process of law, and

*Second*—It attempts to restrict the citizen in his right to acquire, possess and protect property. (Const. Nev., art. 1, secs. 1, 8; U. S. Const., 14th amendment; sec. 1; Fed. Stat., vol. 8, p. 39.)

The prohibition contained in section 12 of Stats. 1909, "which license shall issue only to corporations duly organized for the transaction of such business," is clearly unconstitutional and void. The state has the power and right to regulate the banking business, and may make such regulations as will protect the public and depositors, but the power to regulate does not give the power to prohibit a citizen from following a lawful occupation, upon his complying with such regulations as are lawful.

Banking is not a franchise over which the state can exercise absolute authority. It is simply a business in which all persons may engage. It is not of such character as the law usually looks upon as an incident of sovereignty, nor has it ever been considered as a part of sovereignty. If the state, under the guise of a regulation, can say who shall engage in the banking business, it can also say who shall engage in the hotel business or any other business. Any attempt on the part of the state to do that is certainly an infringement upon the rights retained by the American citizens when they formed their government, hence, banking may be regulated, but it cannot be prohibited.

This court, in *Ex Parte Pittman*, 31 Nev. 43, in speaking of the banking business, clearly and emphatically state that "the business of banking is a lawful business in which it is the inherent right of every citizen to engage will not be questioned. It is a business, however, with which the general public welfare is most clearly identified. Money is said to be the very lifeblood ·of the nation. The banking business has grown to be a part and parcel of our financial system, and is so regarded by both the federal and state governments."

In that particular, the court follows the principle stated
in the *Bank of California* v. *San Francisco*, 142 Cal. 276.
In that case, the court insists that banking is not a fran-
chise; that men have the same right to engage in it that
they have to go into the grocery or dry goods business.
Therefore it is the inherent right of every citizen to
engage in the banking business, or any other lawful pur-
suit, for the purpose of acquiring property.   The right
of acquiring property cannot be taken away from the
citizen by legislation.   (Am. & Eng. Ency. Law, vol. 3,
pp. 792–793, 2d ed.; *Ex Parte Pittman*, 31 Nev. 43; *South
Dakota* v. *Scougal*, 15 L. R. A. 477; *Bank of California* v.
*San Francisco*, 142 Cal. 276; *First State Bank* v. *Shallen-
berger*, 172 Fed. 999; *Slaughterhouse Cases*, 16 Wall. 36.)

*R. C. Stoddard*, Attorney-General, and *L. B. Fowler*,
Deputy Attorney-General, and *S. W. Belford*, for Respond-
ents:

This court has repeatedly affirmed the doctrine that
*mandamus* should not be granted to compel a technical
compliance with the strict letter of the law in disregard
of its spirit.   (*State* v. *Beck*, 25 Nev. 111, citing *Wiedwold*
v. *Dodson*, 95 Cal. 450; High, Ex. Rem., 3d ed. sec. 9; *State*
v. *Board*, 26 Kan. 419.)

Petitioner cannot avail himself of the 1907 act, because
the bank commissioners as constituted thereunder are not
made parties to this action.

The case of *First State Bank* v. *Shallenberger*, 172 Fed.
999, cited by petitioner, does not decide the question here
involved.

In referring to the depositors' "guaranty fund" clause
in the Nebraska act, which, aside from the guaranty, is
similar to the 1909 act of Nevada, the court said, at page
1002: "It is entirely clear that this act of the legislature
does deprive the citizen of his right to engage in a lawful
business, except upon the terms that the state will take
of his property, without his consent, for the private use
of others, and without due process of law."   Also, at
page 1004, the court says: "Neither has it been necessary

to decide whether the state, as a matter of regulation only, could restrict the business of banking to corporations, if the other restrictions, unlike the guaranty fund provision, were all such as lawfully could be imposed upon individuals engaged in that business." The court, in that case, then refers to *State* v. *Woodmansee*, 1 N. D. 246, 11 L. R. A. 420; *Com.* v. *Vrooman*, 164 Pa. 306, 30 Atl. 217, and *State* v. *Scougal*, 3 S. D. 55, 15 L. R. A. 477.

The first two cases above mentioned uphold our contention and directly decide that the state, in the exercise of its police power, has the right to compel the business ·of banking and fire insurance to be transacted under a corporate charter obtained from the state.

The case last cited (3 S. D. 55; 15 L. R. A. 477) is also relied upon by petitioner, but an examination of the constitution of South Dakota reveals a clause therein which is not contained in the Nevada constitution. It is as follows: "No law shall be passed granting to any citizen, class of citizens, or corporations, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens or corporations."

Nevada has no such provision in her constitution, therefore the Scougal case, *supra*, is not an authority in this case. As to the "privileges and immunities clause" contained in the fourteenth amendment of the federal constitution, the court in the Vrooman case, *supra*, says: "The purpose and effect of this amendment has been discussed and declared by the United States courts in many cases, and there ought to be no doubt upon the subject at this time. It was aimed at discriminations made or attempted by the laws of any of the states, against persons upon whom the laws of the United States conferred the rights and privileges of citizenship. But the proper exercise of the police power by the several states is not within the intent or the letter of the amendment." (30 Atl. 217.) See note, *Louisville Ry.* v. *Louisville N. Ry.*, 14 L. R. A. 579; *Powell* v. *Penn*, 127 U. S. 678; *Slaughter-house Cases*, 16 Wall. 36.

Section 1 of the banking act of 1909 expressly declares

the business of banking to be a quasi-public business and subject to regulation and control by the state.

Every presumption is in favor of the constitutionality of the act, because it expresses the judgment of the legislative branch of the government upon that question. The question is not controlled by common-law maxims. The police power must necessarily enlarge its range as business expands and society develops. The business of banking has been declared to be in a class by itself, and, as it is affected with a public interest, to be subject to regulation and control by the state. Such has been the declaration of the legislative and judicial departments of this state. (Stats. 1909, p. 251; *Ex Parte Pittman*, 99 Pac. 700; *State* v. *State Bank and Trust Co.*, 31 Nev. 456.)

Unless the statute in question violates some provision of the constitution, it must be upheld.

In *Ex Parte Boyce*, 27 Nev. 332, this court uses the following language of the U. S. supreme court: "We are reminded by counsel that it is the solemn duty of the courts, in cases before them, to regard the constitutional rights of the citizen against merely arbitrary power. That is unquestionably true. But it is equally true—indeed, the public interests imperatively demand—that legislative enactments be recognized and enforced by the courts, as embodying the will of the people, unless they are plainly and palpably, and beyond all question, in violation of the fundamental law of the constitution."

It is difficult to draw the line as to the extent and scope of the police power of a sovereign state, but it may be safely argued that as the act in question is confined solely to a subject which has been declared by two branches of the government to be affected with a public use, and violates no express provision of the constitution, every intendment in its favor should be indulged in by this court.

In *State* v. *Woodmansee, supra,* 11 L. R. A., 420, the court said: "We have been unable to find an authority, and we have searched diligently, which has ever questioned the right of the legislature in the exercise of police power

to regulate, restrain and govern the business of banking."

See, also, the following cases where the constitutionality of like statutes has been assumed without question: *People* v. *Brewster*, 4 Wend. 496; *People* v. *Bartow*, 6 Cow. 290; *People* v. *Utica Ins. Co.*, 15 Johns. 358; 8 Am. Dec. 243; *Bristol* v. *Barker*, 14 Johns. 205.

"At common law banking is open to all persons, but the states have unquestioned authority to forbid individuals or firms from engaging in banking unless they conform to the laws relating thereto, and the exercise of this power is not a violation of one's personal liberty." (5 Cyc. 433.)

A statute will always be sustained by the courts if there is a reasonable doubt as to its constitutionality. (Cooley, Con. Lim., 7th ed. 252; Lewis's Sutherland Stat. Con., sec. 82; *State* v. *Westerfield*, 24 Nev. 29; *Evans* v. *Job*, 8 Nev. 343; *State* v. *Parkinson*, 5 Nev. 15.)

By the Court, TALBOT, J.:

Petitioner asks for a writ directing the state banking board to issue a license permitting him to engage as an individual in the banking business. The question presented is whether ordinary banking by individuals may be prohibited by statutory enactment, while corporations are allowed and authorized to conduct this business.

In the act of March 24, 1909 (Stats. 1908–09, c. 191), section 2 provides that: "It shall be unlawful for any corporation, partnership, firm, or individual to engage in or transact a banking business within this state on and after the taking effect of this act, except by means of a corporation duly organized for such purpose under the laws of this state; except agencies of foreign corporations now doing a banking business in this state.   *   *   * Any violations of the provisions of this section shall subject the corporation, partnership, firm, or individual so offending to a penalty of twenty-five ($25) dollars for each day of the continuation of such offense, and be cause for the appointment of a receiver by the state

banking board as hereinafter provided, to wind up such banking business."

Section 5 creates the Nevada State Banking Board.

Section 6 provides that: "Said board shall have general supervision and control of banks and banking under the laws of this state, and no person or persons shall be permitted to engage in or transact a banking business save corporations having complied with the provisions of this act.   *   *   *"

Section 12 provides that:. "It shall be unlawful for any person or corporation to conduct a bank or to engage in or transact a banking business in this state without having first obtained a license from the state banking board in the manner hereinafter provided, which license shall issue only to corporations duly organized for the transaction of such business."

Are these provisions in derogation of the state constitution? Article 1, sec. 1, provides that: "All men are, by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring and protecting property, and pursuing and obtaining safety and happiness."

Section 8 provides that no person "shall be deprived of life, liberty, or property, without due process of law," and section 20 that: "This enumeration of rights shall not be construed to impair or deny others retained by the people."

There are only three cases, and these we will review later, which bear directly upon the question as to whether under, or regardless of, an organic act with guaranties similar to the ones contained in our constitution, the individual may be denied the privilege of engaging in the business of commercial or ordinary banking. One of these opinions holds that he cannot be denied this privilege. The other two carry a contrary conclusion, and cite decisions and extracts from text-books based on cases which when properly distinguished do not give them support because they relate to statutes repealed more than half a century ago, by which, during the

period the state banks as distinguished from the national banks issued currency, the states limited to corporations the privilege of doing a banking business which included the power to issue demand notes to circulate as money. As the control of the circulating medium is clearly a government prerogative, which for obvious reasons may be denied to individuals, it was properly held that these banks of issue in the different states before the general government took over the control of the currency under the federal constitution could be limited to corporations at the will of the legislature. These cases have little, if any, bearing upon the question whether the legislature may take away the right of the individual to engage in other kinds of banking, such as receiving and holding deposits with or without interest, the cashing of checks, the issuing and discounting of drafts, and the loaning of money, which have long pertained to the individual without being considered a government prerogative or subject to monopoly or limitation to corporations. That the individual interest must yield to the general welfare, and that banking and other pursuits may be regulated in the public interest, must be acknowledged. (*In re Boyce*, 27 Nev. 330, 65 L. R. A. 47; *Ex Parte Kair*, 28 Nev. 425; *Ex Parte Pittman*, 31 Nev. 56; *Ex Parte Rickey*, 31 Nev. 104.)

It is also conceded that the legislature may suppress any business or calling which is in itself injurious and cannot be so regulated that it will not be detrimental to the public welfare; and, while all occupations are subject to necessary or reasonable regulations and restrictions for the prevention of injury to others, the citizen may not be denied the right to follow ordinary vocations which are not injurious in themselves, or in any way detrimental when properly regulated. All needful enactments may be passed for the protection and welfare of the people as new conditions arise in the affairs of men. No good reason appears for upholding as a police regulation a statute which confers no benefit to the public or any portion of the community, and results only in injury by prohibiting citizens from following a beneficial voca-

tion.   The legislature may regulate when regulation will protect, but may not suppress when inhibition will injure the party pursuing the lawful vocation and proper regulation will prevent injury to others.

In *Ex Parte Pittman*, 31 Nev. 43, 22 L. R. A. (N. S.) 266, we said: "That the business of banking is a lawful business in which it is the inherent right of every citizen to engage will not be denied."

In *First State Bank* v. *Shallenberger* (C. C.) 172 Fed. 1000, the court stated: "The banking business is one of the ancient and ordinary occupations, and has been and is recognized as a lawful business, not only in the State of Nebraska, but in all states of the Union, and in general in all countries that have developed civilization and commerce.   It has not been regarded as a business of such harmful tendencies that society might entirely forbid its exercise.   *   *   *   In the *Slaughterhouse Cases*, 16 Wall. 36, 116, 122, 21 L. Ed. 394, speaking of that portion of the fourteenth amendment to the national constitution, Mr. Justice Bradley said: 'This right to choose one's calling is an essential part of that liberty which it is the object of the government to protect; and a calling, when chosen, is a man's property and right.   Liberty and property are not protected where these rights are arbitrarily assailed. *   *   *   In my view, a law which prohibits a large class of citizens from adopting a lawful employment, or from following a lawful employment previously adopted, does deprive them of liberty, as well as property, without due process of law.   Their right of choice is a portion of their liberty.   Their occupation is their property.'   In the case of *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589, 17 Sup. Ct. 427, 431, 41 L. Ed. 832, the court quoted with approval from the remarks of Justice Bradley, and said: 'The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways, to live and work where he will, to earn his

livelihood by any lawful calling, to pursue any livelihood or vocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.' To the same effect are *Butchers' Union Co.* v. *Crescent Co.*, 111 U. S. 746, 764, 4 Sup. Ct. 652, 28 L. Ed. 585; *In the Matter of the Application of Peter Jacobs*, 98 N. Y. 98, 105, 50 Am. Rep. 636; *People* v. *Marx*, 99 N. Y. 377, 386, 2 N. E. 29, 52 Am. Rep. 34; *City of Chicago* v. *Netcher*, 183 Ill. 104, 55 N. E. 707, 48 L. R. A. 261, 75 Am. St. Rep. 93; *People* v. *Steele*, 231 Ill. 340, 83 N. E. 236, 14 L. R. A. (N. S.) 361, 121 Am. St. Rep. 321; Cooley on Torts, page 277. At common law the business of banking was regarded as one of the lawful occupations in which citizens might engage. In the case of *Bank of California* v. *San Francisco*, 142 Cal. 276, 75 Pac. 832, 64 L. R. A. 918, 100 Am. St. Rep. 130, the court says: 'Admittedly, the mere right to do a banking business is not a franchise in any sense of the word. It belongs to citizens generally, and is a common right, in the same sense that the right to do a grocery or dry goods business is available to all citizens, and no grant from the sovereign is essential to its existence. Any individual or any number of individuals may, under such regulations as the state, in the exercise of its police powers, may legally make, engage therein, without any grant from the state.'"

In the Shallenberger case, the court in holding that the guaranty fund provision invalidates the Nebraska act said that it was not necessary to decide whether the state could limit the business of banking to corporations. But the decision itself, although the validity of statutes providing for a guaranty fund has not yet been determined by the United States Supreme Court, supports the contention that the citizen cannot be deprived of the privilege of engaging in banking; for, if he cannot be required to contribute to a guaranty fund as a condition to following the business, how can the legislature prohibit him entirely from pursuing the occupation when it cannot even enforce such a regulation? In the opinion

in *Noble State Bank* v. *Haskell*, 22 Okl. 84, 97 Pac. 605, sustaining the guaranty provisions of the Oklahoma banking act, the court said: "The question as to what regulations are proper and needful is primarily for legislative decision, yet, when the police power is used to regulate a business or occupation which in itself is lawful and useful to the community, the courts, if called upon, must determine finally whether such regulations as may have been prescribed are so far just and reasonable as to be in harmony with constitutional guaranties. (*Republic Iron & Steel Co.* v. *State*, 160 Ind. 379, 385, 66 N. E. 1005, 62 L. R. A. 136.)"

If the legislature can prohibit the individual from engaging in the banking business, as our statute seeks to do, it is evident that it may also prohibit corporations from engaging in the business, for a corporation, which is merely a creature of the law, can have no greater fundamental rights than the individual, for whom the constitutional guaranties are directly provided. Therefore, if both the individual and the corporation may be prohibited, this business, so essential to the carrying on of commerce and trade, and so necessary to the welfare of the state, may be entirely suppressed. The sustaining of this statute would be an entering wedge and a precedent which would authorize further encroachments upon the rights assured to our citizens by the constitution. If we should uphold as valid this act, denying to individuals the right to embark in the banking business, and the next legislature should pass another providing that corporations could not engage in that pursuit, we perceive no ground upon which that act could be held invalid which would not apply to the present one. We have different statutes regulating mining and providing for the safety of the men employed. The desirability and validity of laws for the prevention of the spread of contagious diseases among animals and certain pests which destroy agricultural crops are recognized.

If the next legislature should pass a law prohibiting individuals from engaging in the business of mining and

farming, and later in the session should pass another act providing that corporations should not engage in either of these pursuits, there would be no reason for holding such acts invalid which would not apply to the statute under consideration. If the argument in favor of this act is good, the same would be sufficient to support legislative enactments prohibiting individuals and corporations not only from engaging in banking, mining, farming, and the raising of live stock, but from merchandising, keeping hotels, operating factories, and pursuing other vocations. Qualifications, examinations, and regulations are prescribed for the practice of law, medicine and dentistry. If the individual may be denied the right to engage in the business of banking, may not the right to follow the various professions be limited to corporations, or even denied to both individuals and corporations? If the state has the right to prohibit the citizen from following ordinary pursuits, may not the legislature exercise a less restrictive power, and either for a price or without charge farm out to individuals, corporations, and monopolies the right to pursue the various vocations upon which the people depend for their living and prosperity?

The constitutional provision that "all men are, by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring and protecting property, and pursuing and obtaining safety and happiness," means more than the protection of property already owned by the citizen. Most people rely for a living upon their pursuit of the ordinary vocations, and the most affluent are dependent in a large degree upon these. Comparatively few are possessed of such means that they will not need to labor or to engage in the ordinary business callings. It would not be creditable for these favored ones, while young and strong, to idle away their time and live as drones upon the world. But, regardless of them, how are the great masses of the people to acquire property, pursue happiness, and enjoy life and liberty unless they are permitted to engage in the ordinary vocations which

are not injurious in themselves, and are beneficial to the individual and the community? It is quite as important that the people be free to enter these callings, and by their labor or investment of money or use of property or conduct of business acquire property which will enable them to obtain safety from want and acquire happiness as that the vested rights of the wealthy be protected.

Any attempt of the legislature to prohibit the pursuit of these harmless and useful vocations, or to restrict them further than necessary for the protection of the public or the prevention of injury to other persons, is an encroachment upon the liberty and just rights of the citizen. If this act can be held a valid exercise of legislative power, other laws may be passed and sustained on the grounds urged in support of this statute, which would be a discredit to a czar or absolute potentate, and which in the face of the constitutional provisions for the protection of the citizen secured by the blood of our forefathers would deny to the people the right to pursue honest, beneficial, and ordinary callings, and result in their injury and distress. That incomparable judge of the human mind and heart said: "You take my life when you take the means whereby I live."

Under the most grinding tyranny, privileges became vested in the lords of France until the peasant was prohibited "to hunt on his own lands, to fish in his own waters, to grind at his own mill, to cook at his own oven, to dry his clothes on his own machines, to whet his instruments at his own grindstone, to make his own wine, his oil, and his cider at his own press, or to sell his commodities at the public market." The subject was not allowed to set a tub of water from the ocean to evaporate in order that he might have salt for his table. The people complained that the taxes and exactions were so great that they could not obtain enough to eat, and the reply from the sovereign was that they could eat grass. In the same year that our own Declaration of Independence was declared, Louis XVI, under the fear of impending revolution, in an edict giving freedom to trades and professions, after recit-

ing the contributions that had been made by the guilds and trade companies, stated that "it was the allurement of these fiscal advantages undoubtedly that prolonged the illusion and concealed the immense injury they did to industry and other infraction of natural right," and that "God in giving to man wants and desires rendering labor necessary for their satisfaction conferred the right to labor upon all men, and this property is the first, most sacred, and imprescriptible."

In *State* v. *Woodmansee*, 1 N. D. 246, 46 N. W. 970, 11 L. R. A. 420, in a decision rendered twenty years ago, the court sustained an act limiting banking to corporations, and went to the extreme of holding that the legislature had the power, "not only to regulate and to restrict the business, but also to grant the right to engage in it to one class and to prohibit it to others, or even forbid it altogether," and said that this power of the legislature had never been questioned by the courts.

The late case of *Weed* v. *Bergh*, 141 Wis. 569, 124 N. W. 666, 25 L. R. A. (N. S.) 1217, upholds as valid the statute in Wisconsin limiting the business of banking to corporations.

Notwithstanding the great regard we entertain for the opinions of the highest courts in these two sister states, which have rendered the only opinions sustaining acts forbidding individuals to engage in ordinary banking, we are unable to agree with their decisions or to find anything in the cases they cite which really support the conclusions they reach. We believe that through inadvertence they have misapplied to ordinary banking one or two cases relating to insurance, and a few others bearing upon the restrictions and limitations which long ago were properly held to pertain to banks that issued notes to circulate as money, a government prerogative, when those institutions were under the control of the states.

As we distinguish these cases, *Weed* v. *Bergh* is without support, except by the decision in *State* v. *Woodmansee*, which is, in turn, unsupported. In the Wisconsin opinion are cited *Meyers* v. *Bank*, 20 Ohio, 282, which has no

application, because it arose under an act of January 27, 1816, "to prohibit the issuing and circulating of unauthorized bank paper," and *Commonwealth* v. *Vrooman*, 164 Pa. 306, 30 Atl. 217, 25 L. R. A. 250, 44 Am. St. Rep. 603, and *People* v. *Loew*, 19 Misc. Rep. 248, 44 N. Y. Supp. 42, relate to statutes pertaining to insurance.   There are reasons for limiting the business of insuring to corporations which do not apply to ordinary banking.   The business of insuring does not appear to have been as commonly exercised by individuals as banking at the time of the adoption of our constitutions, and we are not aware that any branch of the insurance business was ever conducted in this state except by corporations. Especially with life insurance, to which those cases did not apply, it would be desirable or necessary for the protection of persons holding policies to have the business limited to corporations which would be in existence and able to pay upon the death of the insured, which might not take place for half a century after the demise of the insurer, if the business could be followed by individuals.

In the course of a vigorous dissenting opinion in the Vrooman case, Judge Dean said: "Is the business of fire insurance deleterious to the public?  If so, the legislature may absolutely prohibit it.   But no one contends that it is.   On the contrary, it is admitted it is to the advantage of the public.   The legislature admits this by expressly authorizing artificial persons to conduct it.   If such contracts be not injurious to the public, and may not be altogether prohibited, then where is the authority to prohibit one class, natural persons, from entering into them, and specifically empowering another and numerically a very much smaller class, artificial persons, to make them? In so doing the state grants a monopoly in a particular business to a particular class.   * * *  That in some states the legislature has restricted the business of banking to corporations has no analogy to the case in hand. The banking intended to be restricted by the New York act was issuing of notes, receiving of deposits, and discounting.   In *People* v. *Utica Ins. Co.*, 15 Johns. (N. Y.)

358, 8 Am. Dec. 243, and *Bristol* v. *Barker*, 14 Johns. (N. Y.) 205, it was held that the act was only a restraining and regulating act applying to associations of individuals; that, as to them, to do a banking business they must have corporate authority; that an individual was not prohibited from doing a banking business, except as to issuing banknotes. It has always been held to be within the police power of the legislature to restrict the issuing of notes intended to pass as money to corporations. It is a matter which concerns the entire public, who have no opportunity, in the hurry of everyday business transactions of life, to ascertain the value of the promise which is tendered as money."

In *Weed* v. *Bergh* the court admits that "banking is a common-law right pertaining equally to every member of the community; that it cannot be prohibited; that it may be regulated as far as may be reasonably necessary to secure the public welfare and safety, but it must be true regulation, not prohibition under the guise of regulation." (1 Morse on Banks and Banking, sec. 13.) The court based its opinion upon the conclusion that the private banker by engaging in outside business ventures may subject his banking assets to the claims of creditors and prejudice or destroy the remedies of bank depositors, and that, when he dies, the business may have to be temporarily suspended for the purpose of probating the estate, and said: "The obtaining of a bank charter is made by the act practically a matter of course. Three adult residents of the state may at any time associate together, execute the required articles and file them, and the corporation is formed. The danger that any citizen who wishes to go into the banking business will be unable to find two other adult residents who will be willing to join in executing the written articles of incorporation is so small as to be negligible. People can do banking as before, except that they must do it by means of a corporate organization. This is regulation, not prohibition."

In view of the rights which the constitution guarantees specifically to the people, we are unable to concur in the

claim that the denial of the right to the individual to engage in banking does not prohibit him from following the business because he may be able to induce others to join him in forming a corporation.   The assertion that three adult residents may at any time form a corporation and do business as before, except that they must do it by means of a corporate organization, and that this is regulation and not prohibition, would apply with equal force to a law restricting the business of brokerage in grain, cotton, bonds, stocks, and various other vocations to corporations.   That the corporation is a separate entity in law is everywhere recognized.   It was held in *Bank of Augusta* v. *Earle*, 13 Pet. (38 U. S.) 519, 10 L. Ed. 274, that, whenever a corporation makes a contract, it is the contract of the legal entity, of the artificial being created by the charter, but not the contract of the individual members, and that the only rights it can claim are the rights which are given to it in that character, and not the rights which apply to its members as citizens.   Chief Justice Tancy, speaking for the Supreme Court of the United States in that case, said: "We are fully satisfied that the state never intended by its constitution to interfere with the rights of purchasing and selling bills of exchange, and that the opinion of the court does not refer to transactions of this description when speaking of banking as a franchise."

No argument or words defining or masquerading prohibition as regulation can overcome the fact that, if the act is enforced, the citizen will be prohibited from engaging in the banking business as an individual, while the constitutional guaranties protect him as an individual, and do not make an exception in favor of corporations. He may not wish to sacrifice his personality or individuality in conducting the business, nor to importune others to join him, even if assured of their ability and integrity, nor to entrust the control of his money or property to others who would constitute the majority of the board of trustees or directors of any corporation that could be formed.   He may not desire to be burdened with the

expense and formality incidental to the conducting of business by corporations.

We think the danger suggested, that the private banker may engage in other business and become indebted to creditors so as to endanger depositors, may be avoided easily without prohibiting the individual banker from doing business by statutes requiring him to have as much in net assets in order to open a bank as corporations are required to have, and by providing, under penalties as severe as the ones which apply to the embezzlement or improper use of funds of incorporated banks, that the capital with which the private bank is opened shall not be used for speculative purposes, or in any business other than that of the bank, until it is closed and all depositors and creditors are paid, unless the capital is reduced or withdrawn by consent of the banking board. The Indiana act requiring the net worth of the individual members of a banking firm to be equal to at least double the amount of capital paid into the bank was held valid. (*State* v. *Richcreek*, 167 Ind. 217, 77 N. E. 1085, 5 L. R. A. (N. S.) 874, 119 Am. St. Rep. 491.)

By far the heaviest failures in this state have been of incorporated banks, and, as the law existed before amendment, there was not as much liability on the part of the officers for receiving deposits on the eve of a closing of these banks as would have attached to the receipt of deposits by private bankers about to fail. (*Ex Parte Rickey*, 31 Nev. 83.)

Nor do we see that any great danger is likely to result to the public or the patrons of the bank from the death of the private banker if the bank, under proper safeguards provided by the legislature, and the supervision of the bank examiner and the banking board, has been opened and operated on a sound basis and kept solvent, so that, upon the death of the banker, the business may be continued or settled by surviving partners or by executors, special administrators, trustees, or receivers acting under the supervision of the court. With proper protection afforded the depositors and the public by statutory

regulations, it is not necessary, in our view, to prohibit the citizen from engaging in this commendable business.

In *State* v. *Scougal*, 3 S. D. 55, 51 N. W. 858, 15 L. R. A. 477, 44 Am. St. Rep. 756, the most carefully considered of the three cases relating to the right of the legislature to restrict ordinary banking to corporations, the court held that the individual could not be prohibited from engaging in the business, and that the South Dakota act infringed three provisions of her constitution, two of which are similar to sections 1 and 8 in our organic act. In the opinion it is said: "But, under this power, it is not competent for the state to prohibit the citizen from carrying on any trade, occupation, or business that is not offensive to the community, or injurious to society. The business may be regulated, but not prohibited. Mr. Tiedeman in his excellent work on the Limitations of Police Power says: 'In order to prohibit the prosecution of the trade altogether, the injury to the public which furnishes the justification for such a law must proceed from the inherent character of the business. Where it is possible to conduct the business without harm to the public, all sorts of police regulations may be instituted which may tend to suppress the evil. License may be required, the most rigid system of police regulations may be established, and heavy penalties may be imposed for the infraction of the law; but, if the business is not harmful, the prosecution of it cannot rightfully be prohibited to one who will conduct the business in a proper and circumspect manner. Such a one would be deprived of his liberty without due process of law.' (Tiedeman, Pol. Powers, p. 290.) Again the same author says: 'It has been demonstrated and satisfactorily explained in its application to a sufficient number of parallel and similar cases, in order to lay it down as an invariable rule, that no trade can be subjected to police regulation of any kind unless its prosecution involves some harm or injury to the public or third persons, and in any case the regulation cannot extend beyond the evil which is to be restrained. It has also been maintained, and I think

satisfactorily established, that no trade can be pro-
hibited altogether, unless the evil is inherent in the
character of the trade, so that the trade, however con-
ducted, and whatever may be the character of the per-
son engaged in it, must necessarily produce injury upon
the public or upon individual third persons.' (Id. p. 301.)
It necessarily follows from the rules above laid down
that if a business is offensive to the community, or
injurious to society, and is to be prohibited, it must be
prohibited as to all. * * * The government, under
the guise of regulation, cannot prohibit or destroy. It
cannot deprive any citizen of his right to pursue a call-
ing, occupation, or business, not necessarily injurious
to the community, who is willing to comply with all
reasonable regulations imposed upon it. It can never
encroach upon the liberty of the citizen or invade the
rights of property protected by the constitution. (*Re
Jacobs,* 98 N. Y. 98, 50 Am. Rep. 636.) By the act in
question the state admits that banking is not of itself
injurious to the community, as it confers upon corpora-
tions that may be organized under the act full power to
carry on the business of banking. * * * The right of
'enjoying and defending life and liberty, of acquiring
and protecting property, and the pursuit of happiness'
includes the right to pursue any lawful calling, occupa-
tion, or business, and the right to choose the means of
acquiring property and the pursuit of happiness, not
inconsistent with constitutional provisions or the rights
of others. The term 'liberty,' as used in the constitu-
tion, does not mean mere freedom from arrest or
restraint, but it means liberty in a broader and more
comprehensive sense. It means freedom of action; free-
dom in the selection of a business, calling, or avocation;
freedom in the control and use of one's property, so far
as its use is not injurious to the community, and does
not infringe the rights of others; freedom in exercising
the rights, privileges, and immunities that belong to
citizens of the country generally; and freedom in the
pursuit of any lawful business or calling selected by him.

Of but little value to the citizen could be these provisions of the constitution, if the state, through the legislative power, could, at its mere will and pleasure, deprive him of his right to pursue any lawful business or calling not offensive or injurious to the community, and which does not interfere with the equal rights of others, and the right to pursue which he has derived from the common law.  *  *  *  Judge Cooley says: 'What the legislature ordains and the constitution does not prohibit must be lawful.   But, if the constitution does no more than to provide that no person shall be deprived of life, liberty, or property except by due process of law, it makes an important provision on this subject, because it is an important part of civil liberty to have the right to follow all lawful employments.'   (Cooley, Torts, p. 277.) In these constitutional provisions are found the guaranties to the citizen of his right to liberty, his right to the pursuit of happiness, his right to pursue in his own way any lawful business or calling, and his right to property. *  *  *  Mr. Justice Andrews, in delivering the opinion of the court in *Bertholf* v. *O'Reilly,* 74 N. Y. 509, 30 Am. Rep. 323, says: 'The right to liberty includes the right to exercise his faculties, and to follow a lawful avocation for the support of life.'   The case of *Re Jacobs,* 98 N. Y. 98, 50 Am. Rep. 636, involved the right of a citizen to pursue his ordinary calling, of which the legislature by law sought to deprive him.  *  *  *  Mr. Justice Earl in delivering the opinion of the court discussed very fully the powers of the legislature under the constitution of New York, and the police power of the state.   In speaking of liberty, as used in the constitution, he says: 'So, too, one may be deprived of his liberty, and his constitutional rights thereto violated, without the actual imprisonment or restraint of his person.   Liberty, in its broad sense, as understood in this country, means the right, not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue

any lawful trade or avocation.' * * * *People* v. *Marx,*
90 N. Y. 377, 2 N. E. 29, 52 Am. Rep. 34, is another
important case. * * * The power of the legislature
over the business of the citizen was again discussed by
Rapallo, J.   After quoting the sections of the constitu-
tion of that state bearing upon the question, he says:
'These constitutional safeguards have been so thoroughly
discussed in recent cases that it would be superfluous to
do more than to refer to the conclusions that have been
reached bearing upon the questions under consideration.
Among these no proposition is more firmly settled than
that it is one of the fundamental rights and privileges
of every American citizen to adopt and follow such law-
ful industrial pursuit, not injurious to the community,
as he may see fit.'   In *Butchers' U. S. H. & L. S. L. Co.*
v. *Crescent City L. S. L. & S. H. Co.,* 111 U. S. 746, 4 Sup.
Ct. 652, 28 L. Ed. 585, Mr. Justice Field says that among
the inalienable rights as proclaimed in the Declaration
cf Independence 'is the right of men to pursue any law-
ful business or vocation, in any manner not inconsistent
with the equal rights of others, which may increase their
property or develop their faculties, so as to give them
their highest enjoyment.   The common business and
callings of life, the ordinary trades and pursuits, which
are innocent in themselves, and have been followed in
all communities from time immemorial, must therefore
be free in this country, to all alike, upon the same terms.
The right to pursue them without let or hindrance,
except that which is applied to all persons of the same
age, sex, and condition, is a distinguishing privilege of
citizens of the United States, and an essential element
of that freedom which they claim as their birthright.'
In the same case Mr. Justice Bradley says: 'I hold that
the liberty of pursuit, the right to follow any of the
ordinary callings of life, is one of the privileges of a
citizen of the United States,' of which he cannot be
deprived without invading his right to liberty within the
meaning of the constitution. * * * It will thus be

seen that the citizen's right to pursue any lawful business is more than a mere right.   It is property that cannot be taken from him 'without due process of law.' "

In Alabama a statute which made it a misdemeanor for an individual banker to discount negotiable paper at a higher rate of interest than 8 per cent was declared to be unconstitutional because this restriction could not be placed upon the individual banker when it did not apply to incorporated banks.   (*Carter* v. *Coleman*, 84 Ala. 256, 4 South. 151; *Youngblood* v. *Birmingham Trust Co.*, 95 Ala. 521, 12 South. 579, 20 L. R. A. 58, 36 Am. St. Rep. 245, 10 Am. & Eng. Ann. Cas. 904, note.)

In the carefully prepared note in 5 L. R. A. (N. S.) 875, it is said: "Thus in *Bank of Augusta* v. *Earle*, 13 Pet. 519, 596, 10 L. Ed. 274, 311, the court said that it was very clear that at common law the right of banking in all its ramifications belongs to individual citizens, and may be exercised by them at their pleasure.  *  *  *  The statement in the opinion in *State* v. *Richcreek* that it is unquestionably settled that the sovereign authority of the state may regulate and restrain the right of banking is also true, if 'restrain' be understood not to include 'prohibit.'  The question as to the power of a state to prohibit the business of banking by individuals, and to confine such right to corporations exclusively—in other words, to convert what is conceded at common law to be a natural right into a franchise—cannot be regarded as settled by the authorities, except as to the particular banking privilege of issuing bills to circulate as money."

In *Ex Parte Boyce*, 27 Nev. 329, 330, 65 L. R. A. 47, we stated: "The right to acquire and hold property guaranteed by our constitution is one of the most essential for the existence and happiness of man, and for our purposes here we may consider it to be the cornerstone in the temple of our liberties, and that it implies and includes the right to labor.  *  *  *  Broadly speaking, the right to acquire and hold property, which presupposes the one to labor at all ordinary pursuits, is subordinate to this

greater obligation not to injure others, individually or collectively, and to contribute and aid in the support of the goverment in all its legitimate objects."

In *Corfield* v. *Coryell*, 4 Wash. C. C. 380, Fed. Cas. No. 3,230, Justice Washington classed among the fundamental privileges of the citizen "the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may justly prescribe for the general good of the whole."

In the *Slaughterhouse Cases,* 83 U. S. 109, 21 L. Ed. 394, Justice Field said: "This equality of right, with exemption from all disparaging and partial enactments, in the lawful pursuits of life, throughout the whole country, is the distinguishing privilege of citizens of the United States. To them everywhere all pursuits, all professions, all avocations are open without other restriction than such as are imposed equally upon all others of the same age, sex, and condition. The state may prescribe such regulations for every pursuit and calling of life as will promote the public health, secure the good order, and advance the general prosperity of society, but, when once prescribed, the pursuit or calling must be free to be followed by every citizen who is within the conditions designated, and will conform to the regulations." In reference to monopolies he said: "All such grants relating to any known trade or manufacture have been held by all the judges of England, whenever they have come up for consideration, to be void at common law as destroying the freedom of trade, discouraging labor and industry, restraining persons from getting an honest livelihood, and putting it into the power of the grantees to enhance the price of commodities."

In the same cases Justice Bradley said: "And in my judgment the right of any citizen to follow whatever lawful employment he chooses to adopt (submitting himself to all lawful regulations) is one of his most valuable rights, and one which the legislature of a state cannot

invade, whether restrained by its own constitution or not. The right of a state to regulate the conduct of its citizens is undoubtedly a very broad and extensive one, and not to be lightly restricted. But there are certain fundamental rights which this right of regulation cannot infringe. It may prescribe the manner of their exercise, but it cannot subvert the rights themselves. (*Allgeyer* v. *Louisiana,* 165 U. S. 588, 17 Sup. Ct. 427, 41 L. Ed. 832.)

In *Lawton* v. *Steele,* 152 U. S. 136, 14 Sup. Ct. 501, 38 L. Ed. 385, the court said: "The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations."

In *Lochner* v. *New York,* 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937 (*Ex Parte Kair,* 28 Nev. 426), the Supreme Court of the United States held that an act limiting employment in bakeries to sixty hours a week and ten hours a day was an arbitrary interference with the freedom of the individual to contract and to work longer as guaranteed by the fourteenth amendment to the federal constitution. It is said in the opinion: "This interference on the part of the legislatures of the several states with the ordinary trades and occupations of the people seems to be on the increase. In the Supreme Court of New York, in the case of *People* v. *Beattie,* Appellate Division, First Department, decided in 1904 (96 App. Div. 383, 89 N. Y. Supp. 193), a statute regulating the trade of horseshoeing, and requiring the person practicing such trade to be examined, and to obtain a certificate from a board of examiners and file the same with the clerk of the county wherein the person proposes to practice such trade, was held invalid, as an arbitrary interference with personal liberty and private property without due process of law. The attempt was made unsuccessfully to justify it as a health law. The same kind of a statute was held invalid (*Re Aubry*) by the Supreme Court of Washington in December, 1904, 36 Wash. 308, 78 Pac. 900, 104 Am. St. Rep. 952. The court held that

the act deprived citizens of their liberty and property without due process of law, and denied to them the equal protection of the laws. It also held that the trade of a horseshoer is not a subject of regulation under the police power of the state as a business concerning and directly affecting the health, welfare, or comfort of its inhabitants; and that, therefore, a law which provided for the examination and registration of horseshoers in certain cities was unconstitutional, as an illegitimate exercise of the police power. The Supreme Court of Illinois in *Bassette v. People,* 193 Ill. 334, 62 N. E. 215, 56 L. R. A. 558, also held that a law of the same nature, providing for the regulation and licensing of horse-shoers, was unconstitutional as an illegal interference with the liberty of the individual in adopting and pursuing such calling as he may choose, subject only to the restraint necessary to secure the common welfare. See, also, *Godcharles* v. *Wigeman,* 113 Pa. 431, 437, 6 Atl. 354; *Low* v. *Rees Printing Co.,* 41 Neb. 127, 145, 24 L. R. A. 702, 43 Am. St. Rep. 670, 50 N. W. 362."

If the legislature of the State of New York cannot prohibit individuals from following the baking business more than ten hours per day, we are unable to perceive how the legislature in this state can entirely prohibit individuals from following the banking business. Although the latter vocation is more importantly connected with the arteries of trade, both are beneficial and for the public benefit, as well as for the profit of the persons who engage in these vocations, and both are subject to all necessary regulations. In the Lochner case the supreme court said that the provisions in the act for the inspection of premises, for separate washrooms, height of ceilings, for cleanliness, and for the health of the employees were reasonable and valid. Some of the states have laws against the use of alum and other injurious ingredients in baking powders. Because some unworthy or selfish persons may, if not regulated, conduct the baking or the banking business to the detriment of the public in order to enhance their own profits, is no sufficient reason for

denying to all individuals the right to engage in vocations which are beneficial when conducted under proper regulations.

In section 61 of the banking act it is declared that "the holding of any section or part thereof to be void or ineffective for any cause shall not be deemed to affect any other section or part thereof." From this it would appear that the legislature was in doubt as to the validity of some of the provisions. It is conceded that the banking act of 1907 was repealed. As the present act provides for the issuance of licenses to transact banking to corporations only, and nowhere directs the state banking board to issue a license to an individual, there is no authority for the issuance of any license to petitioner. Until provision is made by the legislature, he may conduct the banking business without a license, and without being liable to the penalties sought to be imposed by the act upon individuals for engaging in that business.

The petition for the writ is denied.

SWEENEY, J.: I concur.

NORCROSS, C. J., concurring:

I concur in the judgment. Upon the question of the power of the legislature, as a police regulation merely, to restrict the business of banking to corporations, I express no opinion. Whether we regard the provisions of the act regulating the business of banking which restrict such business to corporations as unconstitutional or not, nevertheless there is no duty imposed by law upon the banking board to issue to any person as an individual a license as prayed for in the petition.